[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 05-12941

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 29, 2007
THOMAS K. KAHN
CLERK

D. C. Docket Nos.
04-02780-CV-T-26-TGW
90-10016-BKC-8G

IN RE:

CELOTEX CORPORATION,
CAREY CANADA INC.,

Debtors.

ASBESTOS SETTLEMENT TRUST,

Appellant,

versus

CITY OF NEW YORK,

Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(May 29, 2007)**

Before BIRCH, CARNES and BRUNETTI,[*] Circuit Judges.

BRUNETTI, Circuit Judge:

The Asbestos Settlement Trust was uniquely created to resolve and liquidate thousands of personal injury and property damage claims against The Celotex Corporation and Carey Canada. This appeal involves one subset of those claims: asbestos property damage claims by the City of New York that the claims administrator allowed but the trustees refused to pay. The City of New York and the trustees dispute the scope of the trustees' power to overrule the administrator's determinations, whether the administrator's decisions or the trustees' decisions are entitled to deference, and ultimately whether the City of New York's claims must be paid. The bankruptcy court granted summary judgment in favor of the City of New York, and the district court affirmed. We affirm in part and reverse and remand in part.

# I

The Celotex Corporation ("Celotex") was a major manufacturer and nationwide distributor of building materials containing asbestos. Carey Canada

---

[*] Honorable Melvin Brunetti, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Inc. ("Carey Canada"), a wholly-owned subsidiary of Celotex, mined and distributed asbestos fiber until it ceased operations in 1986. In October 1990, Celotex and Carey Canada (collectively "Debtors") filed petitions for Chapter 11 bankruptcy protection after being named as defendants in thousands of asbestos personal injury ("PI") lawsuits filed by individuals and hundreds of asbestos property damage ("PD") lawsuits filed by property owners injured by the presence of asbestos-containing materials in their buildings. *In re Celotex Corp.*, 204 B.R. 586, 589, 604-05 (Bankr. M.D. Fla. 1996) (findings of fact and conclusions of law supporting confirmation of the plan of reorganization). The City of New York was one of those PD plaintiffs.

Producing an acceptable and workable Chapter 11 reorganization plan ultimately required multiple proposals by interested parties, modifications, and extensive arms-length negotiations, settlements and compromises over the course of six years. *Id.* at 597 ¶ 68, 601-02 ¶¶ 118, 120. A major point of contention involved how to ensure that PI and PD claimants would be paid in substantially equivalent proportions despite inherent class differences. The number of PD claims was fixed (approximately 4,800 claims from 125 claimants), but the number of PI claimants (over 500,000 at last count) continues to expand as new individuals manifest asbestos-related injuries.

3

The reorganization plan initially proposed by the Debtors in March 1996 contemplated a segregated and fixed fund for PD claims, with PI claims being paid out of the remaining assets. The Debtors' proposal was supported by the Asbestos Property Damage Claimants Committee; however, other interested groups challenged the segregated fund as allegedly too large and therefore unfair to PI claimants, whose fractional recovery against the remaining assets might prove proportionately smaller than that of PD claimants. After lengthy and unsuccessful negotiations, the Debtors' proposed plan was withdrawn. The Bankruptcy Court denied confirmation, terminated the exclusive period under 11 U.S.C. § 1121(b), and opened the doors to interested parties to file proposed plans by July 1996. *Id.* at 591 ¶¶ 13-15.

Competing reorganization plans were filed by parties on both sides of the segregated fund dispute, with the Debtors shifting alliances. The Debtors, in cooperation with those who had opposed the Debtors' initial proposal (collectively, the "Plan Proponents"), proposed one plan. The Asbestos Property Damage Claimants Committee proposed another. *Id.* at 591 ¶¶ 16-19.

This time the competing factions successfully negotiated their differences. By agreement, the Committee's proposed plan was withdrawn and the Plan Proponents' plan was modified and re-filed October 7, 1996. *Id.* at 592 ¶ 21.

4

After subsequent modifications and a hearing on confirmation, the Modified Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for The Celotex Corporation and Carey Canada Inc. (the "Plan") was confirmed by bankruptcy court in a written decision issued December 6, 1996. *Id.* at 616. Among many other things, the bankruptcy court found: "The settlements and compromises contained in the Plan are fair, reasonable, equitable and in the best interest of the Debtors' creditors and their Estates." *Id.* at 602 ¶ 120.

A principal feature of the Plan is the creation of the Asbestos Settlement Trust (the "Trust"), which was established in accordance with section 524(g) of the Bankruptcy Code, a provision specifically applicable to Chapter 11 reorganizations involving asbestos tort liabilities. 11 U.S.C. § 524(g)(2)(B)(I). The Trust is also intended to be a qualified settlement fund under section 468B of the Internal Revenue Code, 26 U.S.C. § 468B. *See* Plan arts. 5.1, 7.3; Trust art. 2.2. It was executed under and is governed by Florida law. Trust art. 9.11.

The purposes of the Trust are essentially to receive and manage the Trust assets (over $1.2 billion), to assume the Debtors' current and future liabilities from asbestos PI and PD claims (estimated at over $13 billion), and "to address, liquidate, resolve, and disallow or allow and pay Asbestos Claims." *In re Celotex*, 204 B.R. at 602 ¶ 121; *see also* 11 U.S.C. § 524(g)(2)(B)(I); Plan art. 5.1; Trust

art. 2.2.  In contrast to the original proposal of segregated funds, the Trust adopts more of a hybrid approach by segregating the processing but not the payment of PI and PD claims.  To ensure substantially equal treatment among both classes, all allowed claims are to be paid out of the Trust as a unified fund, with the distribution of payments administered by a panel of Trustees.  *See* Plan arts. 4.8(a)(8), 5.1; Trust arts. 2.2, 3.3, 3.4.  The claims are processed in the first place, however, under separate procedures administered by different entities.  PI claims are administered by the Trustees under the Asbestos Personal Injury Claims Resolution Procedures ("APICRP").  Trust arts. 3.1(c)(viii), 3.3(b)(iii).  PD claims are administered by the Property Damage Claims Administrator (the "Administrator") under the Asbestos Property Damage Claims Resolution Procedures ("APDCRP").  Plan art. 4.8(a)(8); Trust arts. 1.2, 3.3(c).  As the Administrator is but one person, he is charged with the establishment and supervision of a claims facility (the "PD Facility") to conduct the day-to-day processing and disposition of PD claims under the APDCRP.  APDCRP § IV(A)(35).  The APICRP and the APDCRP, collectively known as the Asbestos Claims Resolution Procedures ("CRP"), are annexed to and incorporated by reference within the Trust Agreement (collectively, the "Trust Documents"), and along with the Trust Agreement are in turn incorporated within the Plan

6

(collectively, the "Plan Documents").[1]  Plan arts. 1.26, 1.106, 1.143, 1.146; Trust art. 1.2.  In the event of inconsistencies, the Plan controls.  *See* Trust art. 9.13.

The APDCRP set forth, among other things, the legal prerequisites for allowing or disallowing PD claims, the standard of proof, the documentation requirements for each category of PD claims, and the procedures for processing, investigating and officially resolving PD claims, including procedures for reconsideration and binding arbitration in the event the claimant is unsatisfied by the PD Facility's determination.  APDCRP § IV(B)-(E).  Although generally "taking into account basic principles and laws of the tort system," the APDCRP relax the usual standards of proof by requiring only "Reasonable Evidence" or "evidence sufficient to present a jury issue under the tort system of one of the Applicable Jurisdictions."  APDCRP §§ III, IV(A)(37), (B)(1).  A major tradeoff is that allowed claims are not paid in full.  Because the Trust's current and future liabilities for asbestos claims greatly exceed the Trust assets, the Plan directs the Trustees to pay all allowed PI and PD claims according to a "Payment Percentage," which the Trustees may adjust from time to time to ensure

---

[1]The Trust Agreement and the APDCRP have been amended from time to time since confirmation.  At issue in this appeal are the "Third Amended and Restated Asbestos Property Damage Claims Resolution Procedures," Annex C to the "Second Amended and Restated Asbestos Settlement Trust Agreement."

7

substantially equal treatment of all present and future claims. *See* Plan art. 5.1. Historically, allowed claims have been paid at approximately 11.3 to 12 percent of the allowed amount.

In the event of disputes under the Plan, the bankruptcy court retains jurisdiction for the purposes of, among other things, assuring performance of obligations under the Trust and enforcing and interpreting the terms and conditions of the Plan Documents. *See* Plan art. 13.3(c)-(e); *see also In re Celotex*, 204 B.R. at 630-32 ¶¶ 68-70.

## II

The City of New York is one of 125 PD claimants but the only claimant in this appeal. In 1999, NYC filed approximately 769 PD claims relating to asbestos in its public buildings. The PD Facility initially allowed 439 and disallowed 330 of NYC's claims. Of those initially disallowed, 52 claims were subsequently allowed by independent arbitrators under the APDCRP provisions for binding dispute resolution. Thus, of NYC's 769 original claims, a total of 491 were allowed and 278 were disallowed under the APDCRP.

When submitted by the Administrator to the Trust for payment, however, the Trustees agreed to pay only a small fraction of NYC's 491 allowed claims. The Trustees refused to pay most, asserting that the Administrator's claim

allowance decisions were, in the Trustees' judgment, erroneous under the ADPCRP's substantive standards. Trustees did not once overrule the Administrator, however, with regard to NYC's 278 claims that had been disallowed.

In September 2000, NYC and the Trustees turned to the bankruptcy court to resolve their emerging dispute, which largely centered on the Trustees' authority to refuse to pay allowed PD claims. In opposing motions, each party sought an order from the bankruptcy court upholding their respective interpretation of the Plan Documents, with NYC also requesting an order directing prompt payment of its allowed claims. The litigation proceeded pursuant to an "Agreed Order" permitting the Trustees to review some of NYC's disputed claims and providing that each party could "present any issues, including claim disputes, to [the bankruptcy court] on a group basis in the interests of efficiency and judicial economy." After further review, the Trustees ultimately paid 73 of NYC's allowed claims in an amount exceeding $11 million. But the Trustees continued to refuse payment of 418 of NYC's 491 allowed claims, prompting NYC to again move to compel payment of all allowed PD claims.

In accordance with the Agreed Order, the Trustees presented to the bankruptcy court demonstrative examples of their various grounds for nonpayment

of the disputed claims. The Trustees identified six "Illustrative Claims," five of which (numbers 1, 2, 3, 4 and 6) are at issue in this appeal. As noted by the district court, the Illustrative Claims were "the Trust's best examples to prove its litigation position." Both parties subsequently filed multiple cross motions for summary judgment.

Addressing the parties' fundamental dispute regarding the relative powers of the Administrator and Trustees over the allowance and payment of PD claims, the bankruptcy court held:

> [T]he documents do not provide authority for the Trust to review the [Administrator's] allowance of specific Claims. This conclusion is based on the findings that (1) the Trust Agreement and the APDCRP specifically delegate to the [Administrator] the power to determine and allow Claims; (2) the Plan documents do not contain any procedures to resolve disputes involving Claims that have been allowed by the [Administrator]; and (3) the absence of a procedure for the Trust's review of allowed Claims is consistent with the "low transaction cost" method of resolving Claims that was fully negotiated prior to confirmation.
> Review by the Trust of determinations by the [Administrator] is limited to evaluating whether the [Administrator] abused his discretion. This conclusion is consistent with the overall structure of the Trust Agreement and the APDCRP, which expressly delegate the fact-finding function and responsibility for the analysis of Property Damage Claims to the [Administrator]. The conclusion is also based on prior decisions of the Court, as well on certain provisions of the Plan documents that confer limited oversight functions on the Trust.

Accordingly, in considering the Trustees' theories for nonpayment of the Illustrative Claims, the bankruptcy court reviewed the Administrator's – not the

Trustees' – decisions under the APDCRP for an abuse of discretion. Finding none, the court directed the Trustees to pay the Illustrative Claims and all of NYC's allowed claims that were similar. The parties subsequently stipulated that the bankruptcy court's judgment would require payment of NYC's 418 disputed claims in an amount exceeding $40.7 million plus interest.

Reviewing the bankruptcy court's decision *de novo*, the district court affirmed in total. The Trustees, as representatives of the Trust, now appeal to this court, which has jurisdiction under 28 U.S.C. § 158(d).

**III**

"As the second court of review of a bankruptcy court's judgment, this court examines independently the bankruptcy court's factual and legal determinations and employs the same two review standards used by the district court." *In re Club Associates*, 951 F.2d 1223, 1228 (11th Cir. 1992) (internal quotation marks, footnote and citation omitted). Specifically, we review a bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *In re Sublett*, 895 F.2d 1381, 1383-84 (11th Cir. 1990). Of course, this being a summary judgment proceeding which by definition involves no findings of fact, only one of those standards is appropriate: *de novo* review. *In re Optical Techs., Inc.*, 246 F.3d 1332, 1335 (11th Cir. 2001). In adversary proceedings in bankruptcy cases,

11

we apply the usual and well-known summary judgment standards. *See* Fed. R. Civ. P. 56; *In re Optical Techs.*, 246 F.3d at 1334.

## IV

Like the bankruptcy and district courts before us, before analyzing the validity of NYC's disputed asbestos claims, we must first resolve the more fundamental issues of the relative powers of the Administrator and the Trustees over the resolution and payment of PD claims and whether either's decisions are entitled to deference. The Trustees claim they possess the discretionary authority to overrule the Administrator and deny payment of claims they determine to be invalid under the APDCRP. Accordingly, the Trustees argue that the bankruptcy court should have reviewed *their* decisions for an abuse of discretion, not the Administrator's decisions which allegedly do not warrant deferential review. NYC responds that the Trustees' actions are ultra vires under the Trust and APDCRP, which properly assign to the Administrator exclusive authority and discretion to resolve PD claims and to direct payment by the Trustees.

To determine the respective powers of the Trustees and the Administrator, we must independently interpret the terms of the Plan Documents, especially the Trust Agreement and the incorporated APDCRP. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989) ("As they do with contractual provisions,

12

courts construe terms in trust agreements without deferring to either party's interpretation."). "The extent of [a trustee's] duties and powers is determined by the trust instrument and the rules of law which are applicable, and not by his own interpretation of the instrument or his own belief as to the rules of law." Restatement (Second) of Trusts § 201 cmt. b (1959). "From the trust, the trustee derives the rule of his conduct, the extent and limit of his authority, the measure of his obligation." *Jones v. First Nat'l Bank in Fort Lauderdale*, 226 So.2d 834, 835 (Fla. Dist. Ct. App. 1969); *see also* Fla. Stat. Ann. § 737.401 (1997). "[T]he trustee can properly exercise such powers and only such powers as (a) are conferred upon him in specific words by the terms of the trust, or (b) are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." Restatement (Second) of Trusts § 186 (1959); *see also id.* § 164. The extent and limit of the Administrator's powers are similarly determined by the terms of the Trust Agreement. Plan arts. 1.116, 5.9(b); APDCRP § IV(A)(34); *see also* Restatement (Second) of Trusts § 37 ("[T]he settlor may grant powers to . . . the trustee, a beneficiary, or a third person otherwise unconnected with the trust.").

With regard to the particular question of whether the Trustees may be duty bound to comply with the Administrator's determinations, the general rule is:

13

"If under the terms of the trust a person has power to control the action of the trustee in certain respects, the trustee is under a duty to act in accordance with the exercise of such power, unless the attempted exercise of the power violates the terms of the trust or is a violation of a fiduciary duty to which such person is subject in the exercise of the power."

Restatement (Second) of Trusts § 185 (1959); *see also Herman v. NationsBank Trust Co. (Georgia)*, 126 F.3d 1354, 1370 (11th Cir. 1997) (applying § 185 cmt. b as "the black letter law of trusts").  The Trustees concede the general proposition "that a trust instrument can delegate a power of control to a third party"; however, they contend in this case that the Plan Documents assign no such power to the Administrator.  We disagree.

As discussed below, the Plan Documents establish a clear separation of powers between the Trustees and the Administrator.  The Trust assigns to the Administrator virtually exclusive authority to implement the APDCRP and to manage the processing and ultimate allowance or disallowance of PD claims.  Although the power to pay allowed PD claims is reserved to the Trustees, the Plan Documents grant them no authority to independently review or overrule the Administrator's determinations.  Instead, the Trustees ordinarily must pay claims as allowed by the Administrator, whose determinations are binding on the Trust.

**A**

14

The Trust Agreement defines the Administrator as "the officer responsible for implementation of the [APDCRP] and day-to-day processing of [PD Claims]." Trust art. 1.2. More specifically, the Administrator is responsible for "[t]he Allowance of PD Claims," which must be done "exclusively in accordance with the APDCRP." Trust art. 3.3(c). The APDCRP are in accord, providing that the "Administrator . . . is responsible for implementing these APDCRP," which "establish the *exclusive procedures* for evaluating, liquidating, paying and disposing of Asbestos Property Damage Claims pursuant to the [Plan]." APDCRP § I (emphasis added).

The APDCRP do not provide any role for the Trustees. In fact, the Trust Agreement expressly prohibits the Trustees' involvement, directing that the Trustees shall not "interfere with the independence of the [Administrator] in administering the APDCRP." Trust art. 3.3(c). The only entity authorized to assist the Administrator in processing property damage claims under the APDCRP is the PD Facility, which is "established by the [Administrator] for the disposition and payment of Claims pursuant to these APDCRP." APDCRP § IV(A)(35).

Under the APDCRP's detailed procedures for processing claims, "the Property Damage Facility shall review the Claim Form to determine whether the necessary documentation . . . has been submitted" and "will determine whether the

15

Claim will be Allowed," including the allowed dollar amount. APDCRP § IV(E)(2); *see also* Plan art. 1.10 (defining "Allowed Amount"). The PD Facility even "may negotiate and compromise Claims." APDCRP § IV(E)(1). The APDCRP provide for review beyond the PD Facility's determination only if a claim is *disallowed* in full or in part, in which case *the claimant* may request reconsideration and ultimately binding dispute resolution before an independent arbitrator. APDCRP § IV(E)(3)-(4). At both levels of appeal, the APDCRP expressly provide for "de novo" review. *Id.* The APDCRP do not provide for any further review by any other entities. If at any time in this process a claim is allowed in full or in part and the claimant accepts that determination (or exhausts both levels of review), review proceedings under the APDCRP conclude and the Administrator submits the allowed claim to the Trustees for payment.

Deeming a claim "allowed" is not just a procedural formality; it also affects the claim's enforceability. "If the Claimant accepts the determination of the Property Damage Facility as to the amount of such Claimant's Allowed Claim, that decision will be final and binding on both parties and may not be reopened." APDCRP § IV(E)(2). Moreover, "[a]n 'Allowed Claim' shall be, and be deemed to be, a judgment against the Trust (as successor for all purposes to the liabilities of Celotex and Carey Canada in respect of Asbestos Claim), in the Allowed

16

Amount of such Claim," subject only to "the Payment Percentage applicable thereto." APDCRP § IV(A)(5) (emphasis added); *accord In re Celotex*, 204 B.R. at 620 ¶ 22. The Plan itself is even more explicit, providing that an "Allowed" claim "shall constitute a *final, non-appealable judgment* against the Trust." Plan art. 1.9 (emphasis added).

Accordingly, once a claim is allowed by the Administrator and submitted to the Trustees, there is little for the Trustees to do beyond applying the payment percentage and paying the claim. *See* Plan art. 4.2(a)(8) ("Each Asbestos Property Damage Claim against Celotex shall be addressed (*i.e.*, Allowed or disallowed and, if Allowed, paid) by the Trust pursuant to and in accordance with the [APDCRP]."). The Trust Agreement directs that "the Trustees shall promptly pay both Asbestos Personal Injury Claims and PD Claims under the terms of both the APICRP and the APDCRP, as applicable." Trust art. 3.3(a). "Payment of PD Claims shall be made by the Trustees in the amount determined by the [Administrator] pursuant to the APDCRP," subject only to the payment percentage. Trust arts. 3.3(c), 3.4(a); *see also* Plan art. 5.1.

Taken together, the Plan, the Trust Agreement, and the APDCRP assign to the Administrator virtually exclusive authority over the day-to-day processing and the allowance or disallowance of PD claims under the APDCRP. Additionally,

17

they assign to the Administrator the power to bind the Trust and, correspondingly, mandate payment by the Trustees in accordance with the Administrator's determinations. We construe such terms as effectively granting to the Administrator the power to control the Trustees' actions in regard to the payment of PD claims. *See* Restatement (Second) of Trusts § 185 (1959) ("If under the terms of the trust a person has power to control the action of the trustee in certain respects, the trustee is [ordinarily] under a duty to act in accordance . . . .").

We reject the Trustees' contention that the Plan Documents should be read as granting only advisory powers based on the Administrator's relationship to the Trust. Their arguments that the Administrator is a mere trust advisor, not a trust officer, and is tainted with conflicts of interest are of doubtful merit. *See* Trust art. 1.2 (defining the Administrator as "the officer responsible for implementation of the [APDCRP]"); *In re Celotex*, 204 B.R. at 599 ¶¶ 92-93 (finding this Administrator "is Disinterested" and that his compensation package "is fair, reasonable and necessary under the circumstances and will help to ensure the successful operation of the Trust").

More fundamentally, however, the Trustees' arguments are misplaced under the Plan and applicable principles of trust law. First and foremost, the Plan Documents' express terms are controlling regarding the respective powers of the

18

Administrator and the Trustees, including any assignment of power to control the Trustees' actions. *See* Restatement (Second) of Trusts § 185 & cmt. b; *see also* Plan art. 13.10; Trust art. 9.9. Because such a power of control is expressly assigned to the Administrator, his otherwise designated relationship to the trust is of only collateral relevance. The holder of a power of control "may be a co-trustee, the settlor, a beneficiary, or a third person otherwise unconnected with the trust. The relationship of the holder of the power is unimportant, except in so far as it may be a factor in determining the nature or extent of the power." Restatement (Second) of Trusts § 185 cmt. a; *see, e.g.*, *Pounds v. Pounds*, 703 So. 2d 487, 490 (Fla. Dist. Ct. App. 1997) (upholding a trust provision that expressly empowered a third party to vote stock held by the trust, regardless of the fact that he had been removed as a co-trustee due to a conflict of interest, as the trust did not require that he be a trustee to exercise the power).

With regard to the nature and extent of the Administrator's power of control, the Trustees put the cart before the horse in first declaring the Administrator to be a non-fiduciary and deducing therefrom that the Trust Agreement cannot be read as assigning any power of control to the Administrator. In the absence of an express provision, the nature of the Administrator's relationship and powers with respect to the trust beneficiaries determines whether

he is a fiduciary. *See* Restatement (Second) of Trusts §§ 164 cmt. h, 185 cmt. c; *see, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 224-25 (1982) (inferring a fiduciary relationship between the United States and Indian allottees based on the nature of the obligations imposed on the government through statutory and regulatory provisions, despite the absence of an express "fiduciary" provision). Here, because the Administrator's power to allow or disallow claims and to direct payment by the Trustees is for the benefit of asbestos claimants rather than himself, the Administrator "is subject to a fiduciary duty in the exercise of the power" and has "discretion as the exercise of it to the extent to which such discretion is conferred upon [him] by the terms of the trust." Restatement (Second) of Trusts § 185 cmts. c, e; *see also Firestone*, 489 U.S. at 113 ("[O]ne is a fiduciary to the extent he exercises any discretionary authority or control."). Thus, the Trustees must ordinarily comply with the Administrator's exercise of his power of control absent "notice that the [Administrator] is violating his duty as a fiduciary." Restatement (Second) of Trusts § 185 cmt. e.

The Trustees correctly point out that the Plan Documents impose procedural and substantive limitations on the Administrator's authority to allow claims. *See, e.g.*, Trust art. 3.3(c) (granting authority to allow claims "in accordance with the APDCRP"); APDCRP § IV(B) (setting forth the prerequisites to allowing claims).

But such provisions are hardly inconsistent with the Administrator's express authority to bind the Trust and the Trustees' ordinary duty to comply with the Administrator's directives. These provisions are certainly relevant to our inquiry, but only in determining the extent of the Administrator's discretion in the exercise of his power of control and whether the Administrator has exceeded that authority. *See* Restatement (Second) of Trusts §§ 185 cmt. c, 187 cmt. d (setting forth factors that may be relevant in determining whether there has been an abuse of discretion, including "the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the [decision maker's] conduct can be judged").

**B**

Turning our attention to the Trustees' powers, the Trustees have failed to cite, and we have been unable to find, a single provision in the Plan, the Trust Agreement, or the APDCRP expressly or impliedly granting the Trustees the broad supervisory authority over the Administrator they claim to possess. As illustrated above, the APDCRP set forth the "exclusive procedures" for the allowance or disallowance of property damage claims, leaving little for the Trustees to do except pay the allowed claims. The Trust Agreement is consistent, providing the

21

Trustees with broad authority over the Trust generally but only limited authority in regard to paying PD claims.

The Trust Agreement provides that the Trustees are "fiduciaries to the Trust" and empowered "to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Article 3.1, [and] any power reasonably incidental thereto." Trust art. 3.1(a). However, the Trustees' powers are also "[s]ubject to the limitations set forth in this Trust Agreement." *Id.*

Among other things, the Trustees are expressly empowered to "establish, supervise and administer the Trust in accordance with the CRP and to administer, amend, supplement or modify the APICRP." Trust art. 3.1(c)(viii). Similarly, the Article governing "Claims Administration" directs the Trustees to "administer the processing and payment of Asbestos Personal Injury Claims in accordance with the APICRP." Trust art. 3.3(b)(iii). Noticeably absent from any of these provisions, however, is any authority to "supervise" or "administer" the *APDCRP* or the resolution of *PD claims* thereunder. Quite the opposite, the Trust Agreement expressly limits the Trustees' ability to exercise any such supervisory authority and commands the Trustees to pay PD claims as allowed by the Administrator.

22

"The Trustees shall not interfere with the actions and decisions of the [Administrator] that are consistent with the APDCRP nor shall the Trustees interfere with the independence of the [Administrator] in administering the APDCRP. . . . Payment of PD Claims shall be made by the Trustees in the amount determined by the [Administrator] pursuant to the APDCRP."

Trust art. 3.3(c).

The Trustees point out that the prohibition against interference with the Administrator's decisions applies only insofar as they "are consistent with the APDCRP." True enough, but to interpret this qualifier as an implied grant of authority to independently review and overrule the Administrator's decisions goes too far. This provision indeed acknowledges that the Administrator does not have unlimited discretion and implies that the Trustees may have *some* role if the Administrator's actions or decisions are not "consistent with the APDCRP." This provision does not, however, contain any affirmative grant of authority to the Trustees to unilaterally determine that the Administrator has exceeded his authority or to expropriate the authority to allow or disallow PD claims. The Trustees' interpretation would allow the exception to swallow the rule. Independence from the Trustees' interference would have little, if any, meaning if the Trustees had the discretion to review the Administrator's decisions to determine whether they may or may not interfere. Effectively, the Trustees would supplant the Administrator as the decision maker in all cases and contravene the

23

plain meaning of the restriction. *See Johannssen v. Dist. No. 1–Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 170 (4th Cir. 2002). The extent of the Trustees' implied authority to interfere with the Administrator's decisions must be far more limited. *See* discussion *infra* Part D.

The Trustees' exclusive authority to pay PD claims also does not imply the power to independently review those claims. Disbursing trust assets is a classic example of a trustee's duty that may be subject to a third party's control. *See* Restatement (Second) of Trusts § 185 cmt. c. Here, the Plan instructs quite simply that each property damage claim "shall be . . . Allowed or disallowed and, if Allowed, paid." Plan art. 4.2(a)(8); *see also* APDCRP § IV(A)(5) ("allowed for payment"). Again, property damage claims are "allowed" or "disallowed" only under the APDCRP, which provide no role for the Trustees. Trust art. 3.3(c); APDCRP §§ I, IV(A)(5), (A)(21), (E). Also, an "allowed" claim "shall constitute a final, non-appealable judgment against the Trust." Plan art. 1.9; *accord* APDCRP § IV(A)(5), (E)(2). Finally, "the Trustees shall promptly pay" allowed PD claims "in the amount determined by the [Administrator] pursuant to the APDCRP." Trust art. 3.3(c). The strict procedures established by these provisions leave the Trustees no leeway to independently reassess PD claims before payment. Indeed, these provisions make the Trustees' payment responsibility mandatory, not

discretionary.  The Trustees' payment of claims *as allowed by the Administrator* "is required by the terms of the trust [and] by the principles of law applicable to the duties of trustees" – specifically, the Trustees' duty to comply with the Administrator's power of control regarding the allowance of PD claims. Restatement (Second) of Trusts § 187 cmt. a (1959) (citing *id.* § 185).

Article 3.4 of the Trust Agreement sets forth the Trustees' only express functions in the course of paying allowed claims, none of which include the power to independently review and overrule the Administrator's determinations. Subsections (a) and (b) require the Trustees to determine the fractional recovery for each allowed claim from the limited Trust assets by calculating and applying the payment percentage to the allowed amount.  *See* Trust art. 3.4(a), (b).  The Trustees are granted no power, however, to adjust the allowed amount, which is determined by the Administrator.  *See* Plan art. 1.10; Trust art. 3.3(c); APDCRP § IV(E)(2).

Subsections (c) and (e) further provide that, subject to certain restrictions, "[t]he Trustees shall have complete discretion to determine the timing and the appropriate method for making payments" (e.g., as installments), as well as "discretion" to alter the order of processing or to temporarily limit or suspend payments (e.g., in the event of limited liquidity).  Trust art. 3.4(c), (e).  However,

25

nowhere is it mentioned that the Trustees may entirely refuse to pay allowed claims. *See* Trust art. 3.3(a), (c) (providing that the Trustees "shall" pay PD claims as allowed); *see also* Restatement (Second) of Trusts § 187 cmt. a (recognizing that a trustee's duty may be mandatory even though the trustee has "discretion as to the time, manner and extent of its exercise").

Finally, subsection (d) empowers the Trustees to conduct limited audits to verify information in the course of paying allowed claims. The Trustees' argument that this provision "contains no such express or implied limitation" is belied by its express terms: "The Trustees shall conduct random or other audits *to verify information* submitted in connection with the CRP in a manner consistent with the CRP." Trust art. 3.4(d) (emphasis added). The Plan Documents must be construed as a whole, with each provision given reasonable meaning and effect. *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir. 1997) (applying Florida law). We therefore cannot interpret the Trustees' narrowly defined audit power as encompassing the far broader powers they seek to conduct a *de novo*, substantive review of allowed PD claims and to entirely refuse payment in their discretion. Such an interpretation would not only render superfluous the express limitations in Article 3.4; it also would be inconsistent with the provisions granting virtually exclusive authority to

26

the Administrator to resolve PD claims and bind the Trust, prohibiting interference by the Trustees, and directing the Trustees to promptly pay PD claims as allowed by the Administrator. *See, e.g.*, Plan art. 1.9; Trust Art. 3.3(a), (c); APDCRP §§ I, IV(E).

In determining the extent and limits of the Trustees' powers with regard to allowed PD claims, we are also guided by another principle of contract construction. "The doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991); *accord Shumrack v. Broken Sound Club, Inc.*, 898 So. 2d 1018, 1020 (Fla. Dist. Ct. App. 2005). Here, the Plan Documents repeatedly manifest the drafters' ability to clearly and precisely delegate and limit authority over the resolution of asbestos claims. Notably, the Plan Documents expressly authorize and provide procedures for two levels of "de novo" review of the PD Facility's determinations, but only by individuals *other than* the Trustees. APDCRP § IV(E)(3)-(4). Also, oversight authority over the APDCRP is vested in the Administrator, not the Trustees, and a PD claim "allowed" under the APDCRP is deemed to constitute a "final, non-appealable judgment." Plan art. 1.9; Trust art. 3.3(c); APDCRP § IV(A)(5),

27

(E)(2). By contrast, there are no provisions expressly empowering the Trustees to conduct their own *de novo* review of and overrule the "judgment" presented to them for payment, let alone issue their own rulings having similar effect. Instead, the Plan Documents enumerate only certain narrowly defined duties related to the Trustees' payment of claims and otherwise command that "the Trustees shall promptly pay" allowed PD claims "in the amount determined by the [Administrator]." Trust art. 3.3(a), (c). The proposition that the Trust Agreement was intended to imply, through vague and ambiguous provisions, a balance of power antithetical to that reflected in its express provisions is simply untenable.

## C

The Trust's assignment to the Administrator of the power to issue binding determinations of PD claims, and the corresponding lack of provisions for the Trustees' independent review of those determinations, are consistent with the purposes of the Trust and the APDCRP. In particular, this system does much to advance the stated goal of providing a "low transaction cost method" of resolving and liquidating property damage claims. APDCRP § III. Given the Trust's limited resources to process and pay claims, the low transaction cost method is intended to strike a proper balance between the sometimes conflicting goals of efficiency and accuracy, while also ensuring that all valid claims are paid in a fair

28

and substantially equivalent manner. *See id.*; *see also In re Celotex*, 204 B.R. at 597-98 ¶ 68 (finding that "the Plan is designed and intended, among other things, to . . . (ii) provide a simple, economical procedure for obtaining and encouraging the prompt, efficient and equitable resolution of all Asbestos Claims, (iii) provide fair and equitable compensation to holders of non-asbestos Claims, and (iv) resolve disputed issues in a complete and fair manner")

The low transaction cost method is evident in many terms of the Trust Agreement and the APDCRP. For instance, the Administrator "shall use his best efforts to complete the processing of all claims within two years of the Effective Date," APDCRP § I; there is an "Incentive Bonus" if the Administrator keeps expenses under 1.5 percent of the allowed amount of claims, Trust art. 8.6(a), APDCRP § IV(A)(6); the standard of proof is reduced to "Reasonable Evidence," or "evidence sufficient to present a jury issue," APDCRP § IV(A)(37), (B)(1); given the historical payment percentages of 11.3 to 12 percent, allowed claims are essentially settled, not litigated, Trust art. 3.4(a); settlement of claims is favored over more expensive and time consuming – though arguably more accurate – forms of dispute resolution, while litigation is least favored, Trust art. 3.3(b)(I), APDCRP § IV(E)(1); and the APDCRP incentivize the final resolution of claims without further levels of review by providing that claimants shall pay the costs of

arbitration unless it results in an award of at least 125 percent of the PD Facility's determination, APDCRP § IV(E)(4). The provisions of the Plan Documents making the Administrator's determinations final and binding on the Trust, as well as the corresponding lack of provisions for further review by the Trustees, are also consistent with this low transaction cost method.

The Trustees nevertheless contend that depriving them of supervisory authority over the Administrator is inconsistent with the additional Trust purposes of paying only valid claims and treating all PI and PD claims in a substantially equivalent manner. *See* Trust art. 2.2; APDCRP § III. We disagree. The Plan Documents are designed to achieve these goals through means other than centralizing all authority over PI and PD claims. For instance, the APICRP and the APDCRP set forth detailed procedures and standards for determining the validity of claims. In confirming both sets of CRP along with the Plan, the bankruptcy court found that they "are fair and reasonable and provide mechanisms for substantially similar treatment of the holders of Asbestos Claims." *In re Celotex*, 204 B.R. at 613 ¶ 227. Similarly, the Trust Agreement requires parity in the timing and manner of payments, Trust art. 3.3(a), and uniform application of the payment percentage, which is expressly intended "[t]o ensure substantially equivalent treatment" among all claims, Trust art. 3.4(a).

We reject the Trustees' arguments that the express terms of the Trust Agreement and the APDCRP are inadequate and that supervisory powers over an allegedly unruly Administrator must have been granted to the Trustees as indispensable to ensuring the Trust purpose of paying only valid claims. The confirmed Plan Documents are "the result of extensive arms' length negotiations" among the interested parties and embody "various settlements and compromises." *In re Celotex*, 204 B.R. at 597 ¶ 68, 601 ¶ 118. Even according to the Trustees, many of the issues they now raise "existed and were known when the Plan was confirmed" and "[s]ome are created by the structure of the Trust Agreement itself." Were such issues intended to be addressed by granting the Trustees supervisory powers over the Administrator, the Plan Documents should have expressly so provided. Instead, they make the Administrator's determinations final and binding and direct the Trustees to pay claims as allowed. "The Plan Documents set forth the entire agreement" of the interested parties, and "[n]o entity shall be bound by any terms . . . other than as expressly provided for [t]herein." Plan art. 13.10; *accord* Trust art. 9.9. To borrow from the bankruptcy court, the parties "are bound by the agreement that they reached."

**D**

31

Given our interpretation of the Plan Documents thus far, the Trustees are left with only limited means to block an alleged violation of the APDCRP, as they have sought to do in this case. We agree with the bankruptcy court's conclusion that the Administrator's actions and decisions in resolving PD claims are subject to review only for an abuse of his discretion under the APDCRP.

In attempting to arrogate supervisory authority over the Administrator, the Trustees contend that *their* decisions to allow or disallow claims under the APDCRP are entitled to deference and are subject to review by the bankruptcy court only for an abuse of discretion. We agree with the Trustees' statement of the standard of review of claims determinations under the APDCRP. We simply disagree as to whose decisions are entitled to such deference in this case. The Trustees' citation of *Firestone* does not help their cause. The Court indeed recognized: "Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Firestone*, 489 U.S. at 111 (citing Restatement (Second) of Trusts § 187 (1959)). But the Court went on to hold: "Firestone can seek no shelter in these principles of trust law, however, for there is no evidence that under Firestone's termination pay plan the administrator has the power to construe uncertain terms or that eligibility determinations are to be given deference." *Id.* The Trustees are similarly situated. As we have already

determined, nothing in the Plan Documents grants the Trustees discretion to independently determine the validity of PD claims under the APDCRP.

In fact, such authority is reserved to the Administrator, who *can* seek shelter in the principles of trust law set forth in *Firestone*, 489 U.S. at 111.  Although such principles are stated in relation to the powers of a "trustee," *see, e.g.*, Restatement (Second) of Trusts § 187 (1959), they are equally applicable in this case to the Administrator, whose determinations of PD claims are binding on the Trust and the Trustees.  A third party with authority to control the actions of a trustee may have discretion and be owed deference with respect to the exercise of that authority according to the same legal principles that apply to a trustee's exercise of discretionary authority.  *See* Restatement (Second) of Trusts § 185 cmt c (cross-referencing § 187).

As to the Administrator's entitlement to deference under the Plan Documents, persuasive is *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559 (1985), which held: "The trustees' determination that the trust documents authorize their access to the records here in dispute has significant weight, for the trust agreement explicitly provides that 'any construction [of the agreement's provisions] adopted by the Trustees in good faith *shall be binding* upon the Union, Employees and Employers.'"  *Id.* at 568

(brackets in original; emphasis added).  Similarly, in *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37 (11th Cir. 1989), this Court determined that "the more deferential arbitrary and capricious standard" should be applied to decisions to deny benefits because the declaration of trust "confer[red] upon the trustees '*full and exclusive authority* to determine all questions of coverage and eligibility.'" *Id.* at 39 (emphasis added).  We reach the same conclusion here as to the Administrator, who has virtually exclusive authority to allow PD claims under the APDCRP and whose determination "shall constitute a *final, non-appealable judgment* against the Trust."  Plan art. 1.9 (emphasis added); *see also* APDCRP § IV(E)(2) ("final and binding on both parties and may not be reopened").  Thus, if there is to be any review at all, substantial deference generally must be accorded the Administrator's determinations.

Of course, even while according the Administrator's determinations the proper deference, the Trustees still lack the authority to determine that the Administrator has *in fact* abused his discretion or to dictate an appropriate remedy.  Ordinarily, the Trustees have a "duty to comply" with the Administrator's determinations by promptly paying allowed PD claims as the Plan Documents require.  Restatement (Second) of Trusts § 185 cmt. b.  Moreover, as already established, the Trustees' duty to comply with the Administrator's determinations

34

is ordinarily non-discretionary.  *See* Trust art. 3.3(a), (c) ("shall"); Restatement

(Second) of Trusts § 187 cmt. a (cross-referencing § 185).  If the Trustees do

notice an anomaly in the allowance of PD claims, the Trustees have two avenues

open to them under the Plan Documents.

The first is to bring such issues to the Administrator's attention in

accordance with the Trustees' duty to consult with the Administrator "on the

implementation and administration of the APDCRP."  Trust art. 3.2(e); *see also*

Restatement (Second) of Trusts § 185 cmt. e (contemplating an "objection of the

trustee").  Of course, because such consultation must be conducted "without

limiting or abridging Article 3.3(c)," which prohibits the Trustees from interfering

with the Administrator's independence in administering the APDCRP, the

Trustees must leave it to the Administrator to ultimately decide whether or how to

resolve any perceived errors.  Trust arts. 3.2(e), 3.3(c).

If consultation does not result in a satisfactory resolution and the

Administrator insists on the Trustees' payment of PD claims as allowed, which the

Trustees have reason to believe constitutes an abuse of the Administrator's

discretion under the APDCRP, the Trustees' only recourse is to apply to the

bankruptcy court for instructions.  *See Firestone*, 489 U.S. at 112; Restatement

(Second) of Trusts §§ 185 cmt. e, 201 cmt. b.  The bankruptcy court retains

jurisdiction over the Plan for just such purposes. *See* Plan art. 13.3(c)-(e) (reserving jurisdiction in the bankruptcy court to enforce the terms of the Plan Documents); Trust art. 9.13 ("Any disputes that arise under this Agreement or under the annexes hereto shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided . . . ."). Moreover, given the express limitations on the Trustees' authority respecting allowed PD claims, the Trustees' limited power to petition the bankruptcy court for relief is all that is "necessary or proper to fulfill the purposes of the Trust" and to comply the Trustees' fiduciary responsibilities. Trust art. 3.1(a); 3.3(c).

We emphasize that in petitioning the bankruptcy court for instructions, the Trustees must proceed promptly and without undue delay. *See* Trust art. 8.4 (permitting application "on an expedited basis"). In all their actions, the Trustees must continue to ensure their own compliance with the Trust Agreement and their fiduciary duties to all claimants, including their duty to pay PI and PD claimants without giving preference to or advancing or delaying payments as to either. *See* Trust art. 3.3(a). The Trustees' fiduciary duties extend to the City of New York and all other claimants with PD claims that have been "allowed," whether the Trustees agree with that determination or not, for the Trustees' opinion is not controlling. Although the Trustees' belief that the Administrator has abused his

36

discretion may *temporarily* relieve them of their ordinary duty to pay allowed PD claims, it does not relieve them of their ordinary fiduciary duties to the affected PD claimants. In all cases, the Trustees have a duty either to pay PD claims as allowed, or, in exceptional cases, to seek promptly the bankruptcy court's instructions. *See* Restatement (Second) of Trusts § 185 cmts. b, e. The Plan permits nothing less.

## V

The bankruptcy court applied the proper abuse of discretion standard of review and engaged in a thorough review of the Trustees' objections to the Illustrative Claims. Upon *de novo* review, we affirm the great majority of the bankruptcy court's judgment requiring payment of the Illustrative Claims and all similar claims, with one exception.

## A

Illustrative Claim 1 involves thermal system insulation (TSI) in the Manhattan Criminal Court building that was produced using a Carey patent but by a third-party manufacturer. NYC concedes that under New York law products liability does not extend to a patent or trademark licensor except "where, for example, it has had significant involvement in distribution or is capable of exercising control over quality." *Harrison v. ITT Corp.*, 603 N.Y.S.2d 826, 826

(N.Y. App. Div. 1993); *accord Laurin Mar. AB v. Imperial Chem. Indus. PLC*, 752 N.Y.S.2d 855 (N.Y. App. Div. 2003); *see also Brumbaugh v. CEJJ, Inc.*, 547 N.Y.S.2d 699, 701 (N.Y. App. Div. 1989). Applying this standard, we conclude that NYC has failed to submit the requisite "Reasonable Evidence" to present "[a] legally viable cause of action" under New York law. APDCRP § IV(B)(1)(c); *see also id.* § IV(A)(37).

The evidence here includes labels indicating that the TSI in question was manufactured by Johns-Manville Corporation using a 1930 patent held by The Philip Carey Manufacturing Company, a predecessor of Celotex. The patent, U.S. Patent No. 1,782,383 (filed Feb. 19, 1928) (issued Nov. 18, 1930), covers a manufacturing process whereby emulsified gas is formed within the insulation mixture prior to molding, supposedly producing a lighter, micro-porous insulation with increased heat insulation efficiency but without sacrificed mechanical strength. According to the patent, that process is applicable to a variety of formulations of insulation, some that do not contain asbestos and some that do, including the 85% magnesia TSI at issue in Illustrative Claim 1. There is no evidence in the record, however, that Carey was anything more than a mere licensor. There is no evidence, for example, that Carey had significant involvement in Johns-Manville's manufacturing and distribution process or had

38

the capability – other than as a mere licensor – of exercising control over quality. *See Harrison*, 603 N.Y.S.2d at 826.

We are unpersuaded by NYC's argument that "a patent licensor can always control whom and under what circumstances he licenses his product, which by itself should suffice." Were that sufficient, *Harrison* would have come out differently, for the same can be said of any licensor. Although the actual exercise of control is not required by *Harrison*, the requisite "capability" of exercising control must exceed the mere existence of a licensing arrangement, whether it be pursuant to special terms in the licensing agreement or a more extensive relationship between the parties. *See, e.g.*, *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939, 944-45 (Ariz. 1990) (applying strict products liability to a trademark licensor who was also the parent company of the entities that "technically accomplished" the research, design, manufacture, distribution, and sale of the defective product), *cited in Harrison*, 603 N.Y.S.2d at 826.

Although the bankruptcy court was correct to view the degree of control issue as a question of fact, the evidence presently in the record is insufficient to present a viable cause of action under New York law. *See Harrison*, 603 N.Y.S.2d at 826 (affirming order granting summary judgment dismissing the complaint); *see also* APDCRP § IV(A)(37) (defining "Reasonable Evidence" as "evidence

39

sufficient to present a jury issue under the tort system of one of the Applicable Jurisdictions"). We therefore reverse the bankruptcy court's grant of summary judgment to the City of New York on Illustrative Claim 1 and all similar claims.

We also remand to the bankruptcy court for further proceedings, however. Although we uphold the Trust's decision to withhold payment of Illustrative Claim 1 pending court review, this raises additional issues the bankruptcy court has yet to consider. For instance, given that Illustrative Claim 1 was selected by the Trustees and may not be truly representative of NYC's patent-based claims, our determination that the record evidence is insufficient as to Illustrative Claim 1 is not necessarily determinative as to all similar patent-based claims. Moreover, as to those claims that do lack sufficient evidence, including Illustrative Claim 1, it may be necessary to remand to the Administrator for further processing in order to preserve NYC's procedural rights to receive notice of any deficiencies and to submit additional evidence. *See* APDCRP § IV(E)(2)-(3). We leave it to the bankruptcy court to resolve such issues in the first instance.

**B**

We affirm as to the remaining claims. Specifically, we find the Administrator did not abuse his discretion in allowing Illustrative Claims 2, 3 and

4, and we affirm the bankruptcy court's judgment directing the Trust to pay these and all similar claims for the reasons stated by the bankruptcy court.

We similarly affirm as to Illustrative Claim 6 and all similar claims, but without considering the Trustees' contention that the bankruptcy court erred in adopting an even more deferential standard of review – requiring "clear and convincing evidence that the actions of the arbitrator were fraudulent or collusive" – for claims allowed after binding dispute resolution under APDCRP § IV(E)(4). We need only determine that an independent arbitrator's claim allowance decisions – which are made after *de novo* review, and which the Plan does not distinguish from those made by the Administrator, *see* Plan art. 1.9 – are entitled to at least as much deference as we accord the Administrator's decisions. The Trustees have preserved no substantive objections to Illustrative Claim 6 beyond those also asserted in regard to Illustrative Claims 2, 3 and 4, and they have raised no factual issues related to Illustrative Claim 6 that would require a materially different analysis. Thus, our disposition of Illustrative Claim 6 is identical under the same abuse of discretion standard.

## C

In summary, as to Illustrative Claims 2, 3, 4 and 6, we affirm the judgment of the bankruptcy court granting the City of New York's motion for summary

41

judgment and ordering the Trustees to pay these and all similar claims. As to

Illustrative Claim 1 and all similar claims, however, we reverse and remand for

further proceedings consistent with this opinion.

**AFFIRMED in part; REVERSED and REMANDED in part.**