UNITED STATES ex rel. Chester SALDIVAR, Plaintiffs,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC., Defendant.

Civil Action No. 1:10–CV–1614–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 17, 2013.

Jamie M. Bennett, Melissa A. Roover, Nathan M. Peak, Sidney Schupak (Ashcraft & Gerel, LLP); Andrea Solomon Hirsch (Herman Gerel, LLP), for Plaintiffs.

James F. Bennett, Lisa S. Hoopenjans, Megan Heinsz, (Dowd Bennett LLP); Joseph Matthew Maguire, Jr. (Parks Chesin & Walbert, P.C.), for Defendant.

Neeli Ben–David, Mina Rhee (U.S. Attorney's Office–ATL), for United States.

### ORDER

AMY TOTENBERG, District Judge.

Plaintiff Chester Saldivar ("Relator") brings this case as a *qui tam* relator on behalf of the United States government. Relator alleges that his former employer, Defendant Fresenius Medical Care Holdings, Inc. ("Fresenius") violated the False Claims Act by fraudulently billing the Centers for Medicare & Medicaid Services ("CMS" or "Medicare") for medications it received for free. This matter is before the Court on the parties' cross-motions for

summary judgment [Docs. 93, 100].[1]

## I. STANDARD FOR SUMMARY JUDGMENT

The Court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The Court should grant the motion only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

■ The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States,* 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## II. FACTUAL BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, the court must review all facts and inferences in the

---

1. The Court **GRANTS** Fresenius's Motion for Leave to File Notice of Supplemental Authority [Doc. 131]. Relator has also filed a Third Motion to Amend Complaint [Doc. 92], which the Court addresses in a separate Order.

light most favorable to the non-moving party). This statement does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir.2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.[2]

Fresenius is the owner and operator of outpatient renal dialysis facilities across the country. (Def. Mot. Summ. J., Ex. A ("Castle Decl.") ¶ 5, Doc. 100–4.)[3] Fresenius's patients suffer from chronic renal failure that has advanced to End Stage Renal Disease ("ESRD"). (*Id.* ¶ 6.) ESRD patients often require hemodialysis, which uses artificial methods to clean and filter the blood. (*Id.*) For many ESRD patients, the treatment plan includes the administration of the intravenous drugs epoetin alfa (patented and branded as Epogen® ("Epogen") by the pharmaceutical company Amgen) and paricalcitrol (patented and branded as Zemplar® ("Zemplar") by the pharmaceutical company Abbott). (*Id.* ¶¶ 13, 16, 18.) These medications are administered by injecting them through syringes inserted into plastic blood lines (tubing) that are connected to patients' vascular access points. (*Id.* ¶ 8.)

Manufacturers of Epogen and Zemplar distribute the drugs in individual vials. Consistent with industry standards and federal regulations, the manufacturers include in each vial a surplus volume of each drug, referred to as "overfill." (*Id.* ¶¶ 22–23.) For example, a 5–unit vial of Zemplar may, in fact, contain 6 units of the drug. (*See id.*) This overfill ensures that the nurses administering the drug will be able to extract at least the labeled amount from the container. (*Id.* ¶ 22.) The amount of overfill is determined by the manufacturer and can vary. (*Id.*)

When Fresenius purchases Epogen or Zemplar from the manufacturer, it purchases the drugs for a contracted price based on the number of "packs", "cases", or "vials" it receives. (*See* Ex. HH ("McGorty Decl.") ¶ 14, Doc. 103–5; *Id.* Ex. 5, Doc. 103–5 at 100 and 103–6 at 1–7.) For example, a "pack" of Epogen consists of 10 vials at different units, and a "case" consists of 10 "packs". (*Id.* ¶ 14a.) According to Fresenius, it never purchases Epogen or Zemplar based on the actual amount of drugs in each vial. (*See id.* ¶¶ 14a, 14b.) Thus, even though the labeled amount on each vial might read, for example, 5 units, Fresenius claims that it contracts to purchase the entire contents of the vials, including the 5 units and any additional overfill. (*Id.*)

During the times at issue in this case, Fresenius used overfill in Epogen and Zemplar vials to fill additional or larger doses that were then administered to patients. (Castle Decl. ¶ 24, Doc. 100–4.) According to Fresenius's Senior Vice President and Deputy General Counsel for Litigation, Ronald L. Castle, Fresenius "has openly, routinely, and regularly directed its professional facility staff (nurses) to utilize as much of the overfill as possible."

---

**2.** Relator failed to provide "a separate, concise, numbered statement of the material facts to which [he, as] the movant contends there is no genuine issue to be tried," as required by this Court's Local Rules. LR 56.1B(1), NDGa. "The court will not consider any fact ... set out only in the brief and not in the movant's statement of undisputed facts." *Id.* Fresenius, on the other hand, filed a Statement of Undisputed Material Facts ("SUMF") (Doc. 100–2) to which Relator responded (Doc. 120). Accordingly, the Court primarily derives the facts described here from the record citations Fresenius provides, consistent with the legal standard for summary judgment described above.

**3.** Hereinafter, all lettered exhibits refer to exhibits attached to Fresenius's Motion for Summary Judgment, unless otherwise noted.

(*Id.*) The practice of using overfill eliminated wastage and allowed for a more efficient utilization of the expensive drug. (*Id.* ¶¶ 24–26.) Relator does not challenge Fresenius's *use* of overfill and in fact, admits that overfill use "is and always has been legal." (*E.g.*, Relator Resp. Def. SUMF ¶¶ 16, 18–30, Doc. 120.) *See also* 75 Fed.Reg. 73170, 73467 (Nov. 29, 2010) ("Our policy is not intended to allow, prohibit, or otherwise regulate the amount of overfill that manufacturers include in a container, or how that overfill is used in clinical practice.").

Castle admits, however, that Fresenius not only *used* overfill but also that Fresenius has billed Medicare for the use of overfill. "[Fresenius] has openly invoiced and received reimbursement from the Medicare program at the per 1000–units (Epogen®) or per-microgram (Zemplar®) rates established by CMS for the Medicare program *without regard* to whether some or all of the medication actually administered to particular patients can literally be attributable to the 'overfill' portion of the medication in the vial." (*Id.* ¶ 24.) Relator challenges this overfill billing practice as a violation of the False Claims Act because, according to Relator, Fresenius does not purchase the overfill and thus cannot be reimbursed for its use.

### III. PROCEDURAL BACKGROUND

Relator sued Fresenius in this Court on January 24, 2011,[4] alleging several claims:

- Count 1: Violation of the FCA for submitting false or fraudulent claims with respect to Zemplar overfill reimbursement and making false records or statements material to such claims

- Count 2: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Zemplar overfill reimbursement as described in Count 1

- Count 3: Violation of the FCA by submitting false or fraudulent claims with respect to Epogen overfill reimbursement and making false records or statements material to such claims

- Count 4: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Epogen overfill reimbursement as described in Count 3

- Counts 5–22: Violation of various state-law False Claims Act equivalents

Fresenius filed a Motion to Dismiss on July 6, 2011. (Mot. Dismiss, Doc. 42.)[5] Fresenius argued that the False Claims Act's "public disclosure" bar precludes Relator from bringing these claims. Fresenius also argued that Relator had failed to plead his fraud claims with sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Finally, Fresenius asserted that the state-law equivalents of the public disclosure bar preclude Rela-

---

4. On May 26, 2010, Relator filed his initial Complaint along with a motion to seal the case pursuant to 31 U.S.C § 3730(b)(2). (Docs. 1, 2.) Relator filed an Amended Complaint on January 24, 2011 to add claims under several state False Claims Act statutes. (Doc. 18.) The United States declined to intervene on March 24, 2011. (Doc. 24.)

5. Prior to the Court's ruling on this Motion to Dismiss, on December 14, 2011, Relator filed a Motion for Leave to File a Second Amended Complaint. (Doc. 49.)5 Relator sought to add a retaliation claim under 31 U.S.C. § 3730(h) that was currently pending in a related proceeding in a California state court. The Court granted this motion as unopposed. (Doc. 57 at 25.)

tor from pursuing his state law claims and, in any case, he had failed to meet the procedural requirements of those statutes.

On March 26, 2012, 906 F.Supp.2d 1264 (N.D.Ga.2012), the Court granted in part and denied in part Fresenius's Motion. (Doc. 57.) The Court first rejected Fresenius's argument regarding the public disclosure bar. The Court then held that Relator's firsthand knowledge of Fresenius's billing scheme provided sufficient indicia of reliability to support his FCA claims and survive Fresenius's motion to dismiss.[6] Finally, the Court dismissed all Relator's state law claims. The Court explained that Relator's firsthand knowledge was limited to his work with the Los Angeles South and Nevada Region clinics. Accordingly, his Complaint provided neither the level of detail nor indicia of reliability to support his state-law claims on behalf of the identified state plaintiffs, with the exception of California and Nevada. The Court then found that Relator had failed to allege compliance with California and Nevada's procedural requirements for *qui tam* cases. Accordingly, the Court granted Fresenius's motion to dismiss all of Relator's state-law claims.

On April 23, 2012, Relator filed a Motion for Reconsideration or, alternatively, Motion for Leave to file an Amended Complaint. (Doc. 63.) Relator primarily sought to amend the Complaint to add allegations that Fresenius's false claims were part of Fresenius's nationwide policy of billing for overfill. On May 21, 2012, the Court held a status conference to address Relator's Motion and other discovery issues. (*See* May 21, 2012 Minute Order, Doc. 68; May 21, 2012 Hrg. Tr., Doc. 71.)

The parties agreed to proceed with discovery, prioritizing discovery related to Fresenius's national policy and its implementation related centrally to the claims and defenses in this matter. Thus, the Court denied Relator's Motion (Doc. 63) with the understanding that Relator may renew his Motion to Amend at a later time.

Discovery proceeded for several months, and on October 3, 2012, the Court held another status conference. (*See* Oct. 3, 2012 Conference Tr., Doc. 116.) During this conference, the parties defined two issues to be addressed in threshold cross-motions for summary judgment: (1) whether a rule or statute existed at any relevant time that allows or prohibits the billing for overfill (the falsity element of the FCA); and (2) whether Fresenius is entitled to a government knowledge or authorization defense (the government knowledge defense). (*See* Oct. 3, 2012 Order, Doc. 83.)

As to this second issue, Relator's counsel made clear that Relator was prepared to move for summary judgment on the basis that Fresenius could not assert a "government knowledge" defense because such defense is equitable in nature and does not apply to the facts presented in this case. (*See, e.g.,* Oct. 3, 2012 Conference Tr. at 5, 12–14, Doc. 116.) Counsel for Relator clarified that Relator was "not prepared without additional discovery to respond to any issue that might go beyond [either of these two issues] such as, for example, a motion by the defendant . . . seeking a ruling that they did not have intent to deceive." (Oct. 3, 2012 Conference Tr. at 9, Doc. 116.) Thus, as far as Relator was

---

6. Moreover, Fresenius now admits to openly billing for Zemplar and Epogen overfill. (*See* Castle Decl. ¶ 24, Doc. 100–4; *see also* Oct. 3 Conference Tr. at 5:17–5:18, 7:23–7:25, Doc. 116 ("I agree that discovery to date on the deposition front has focused in on our nation-al practice . . . [so] we're prepared to file a motion for summary judgment on the legal question of whether this [national practice of capturing and billing the Government for overfill] is prohibited at all.").)

concerned, there were simply two issues ripe for adjudication on summary judgment: (1) falsity under the FCA and (2) Fresenius's equitable "government knowledge" defense.

In response, counsel for Fresenius agreed to limit the scope of the first round of summary judgment briefing to the falsity element of the FCA and Fresenius's government knowledge defense. (*See id.* at 10.) In an effort to facilitate the Court's review of these two issues, the parties then agreed to proceed in the following manner.

(1) Relator would file an opening partial motion for summary judgment addressing (a) falsity under the FCA and (b) Fresenius's equitable government knowledge defense.

(2) Fresenius would file a response that both responds to Relator's motion and incorporates Fresenius's own partial motion for summary judgment. Fresenius's partial motion for summary judgment would address the sole issue of falsity under the FCA. Importantly, counsel for Fresenius made clear that it *would not move on the intent element.* (*Id.* at 10 ("[W]e don't intend to move on the intent element.").) [7]

(3) Relator would file a memorandum that serves as both a reply to Fresenius's response to his partial motion for summary and a response to Fresenius's partial motion for summary judgment.

(4) Fresenius would file a reply to Relator's response to Fresenius's partial motion for summary judgment.

(Oct. 3, 2012 Conference Tr. at 16–18, Doc. 116; *see also* Oct. 3, 2012 Order at 2, Doc. 83.)

Consistent with this schedule, the Relator filed a motion for partial summary judgment addressing the two threshold issues. (Doc. 93.) As to the government knowledge defense, Relator principally argued that, "because Congress has determined by statute that Medicare may not pay for free goods . . ., Fresenius cannot invoke estoppel against the government to bar these claims." (Relator Memo. Supp. Cross Motion Partial Summ. J. ("Relator Summ. J. Br.") at 19–20, Doc. 93–1.) Fresenius's partial motion for summary judgment on the government knowledge defense solely attacked what Relator believed to be Fresenius's defense of estoppel or laches. (*See id.* at 19–24.)

Fresenius then filed its motion for summary judgment, which simultaneously responded to Relator's motion. (Doc. 100.) As expected, on the first issue of the falsity element of Relator's FCA claim, Fresenius argued that no rule prohibited it from billing for overfill and thus its billing practices did not violate the FCA. (Def. Br. Opp. Relator Mot. Summ. J. & Supp. Mot. ("Def. Summ. J. Br.") at 11–32, Doc. 107–2.)

Fresenius's response regarding the second issue (the government knowledge defense) was not expected, however. Although Fresenius used estoppel-sounding language in its response, (*see* Def. Summ.

---

**7.** It appears that to some extent, opposing counsel were speaking past each other. For example, later in the hearing, Counsel for Fresenius suggested that its "government knowledge" defense was "one of [Fresenius's] primary defenses to the intent element of the case." (Oct. 3, 2012 Conference Tr. at 7, Doc. 116.) Nonetheless, the Court and Relator understood that this first threshold round of summary judgment briefing would not address the intent element of the case, and counsel for Fresenius expressly stated that Fresenius did not intend to move on the intent element.

J. Br. at 16, Doc. 107–2 ("[I]t is impossible to believe that Congress, CMS, DOJ, OIG and MedPac would have overlooked the open practice of dialysis facilities billing for overfill, if, in fact this practice violated the law.")), Fresenius expressly abandoned any estoppel or laches argument. (Def. Summ. J. Br. at 14, Doc. 100–7.) According to Fresenius, it "is not attempting to raise an affirmative defense of estoppel or laches against the government." (*Id.*) Accordingly, the Court **DENIES AS MOOT** Relator's partial motion for summary judgment on the defense of estoppel or laches.

Fresenius next clarified that it relies on "government knowledge" for two reasons. First, Fresenius asserted that evidence of "government knowledge" is relevant to the falsity element of the FCA claim because it supports Fresenius's interpretation of CMS regulations. (*Id.* at 15.) Fresenius then explained that the "government knowledge" defense is part of its argument that it lacked the necessary "fraudulent intent" required for FCA claims. (*Id.*) Accordingly, and despite its agreement not to do so at this time, Fresenius then moved for summary judgment on the intent element.

■ Relator called foul. Referencing the October 3, 2012 status conference, Relator recognized, and the Court agrees, that "this Motion [on the intent element] is not properly before the Court." (Relator Opp. Def. Mot. Summ. J. & Reply Def. Opp. Relator Mot. Summ. J. ("Relator Reply") at 4, Doc. 126; *see also id.* at 4 n. 3.) Consistent with the parties' agreement at the October 3, 2012 status conference, and the Court's Order of the same day, the issue of Fresenius's intent as an element of Relator's FCA claim is not properly before

the Court at this time. Thus, the Court **DENIES** Fresenius's Motion for Summary Judgment to the extent it seeks a ruling on the intent issue. (*See infra* Part IV.D.) Absent an order to the contrary, either party is free to move for summary judgment on the issue of intent after the close of discovery, pursuant to the Court's Guidelines (Doc. 51), the Court's Local Rules and the Federal Rules of Civil Procedure.

The only legal question requiring adjudication on the parties' cross-motions for summary judgment is whether, during the relevant time in this case, Fresenius's requests for reimbursement for the use of overfill satisfies the falsity element of a False Claims Act claim—that is whether any rule, policy or other principle of law authorized or prohibited billing Medicare for the use of overfill. As explained below, the Court finds that, from 2006 through 2010, dialysis centers like Fresenius did not incur a cost associated with overfill and thus could not bill the Government for providing overfill to patients.

## IV. ANALYSIS

■ "To establish a [presentment] cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States ex rel. Walker v. R & F Props. of Lake County, Inc.,* 433 F.3d 1349, 1355 (11th Cir.2005) (citing 31 U.S.C. § 3729(a)).[8] At issue in this Order is the first element: whether billing Medicare for ESRD overfill constitutes a false claim.

8. These elements are required to support Relator's "presentment" claim under 31 U.S.C. § 3729(a)(1)(A). The parties center their discussion on whether the billing (presentment) of overfill constitutes a false claim, and the Court therefore does the same. Relator also has a "use" claim brought under § 3729(a)(1)(B) (recognizing liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or

Relator argues that billing Medicare for ESRD overfill constitutes a false claim because Medicare reimburses only for "expenses incurred" for medically necessary items and services. (Relator Summ. J. Br. at 1, Doc. 93–1 (quoting 42 U.S.C. § 1395y(a)).) According to Relator, providers of ESRD drugs such as Fresenius do not incur an expense for overfill and thus cannot bill Medicare for it. Relator responds that Medicare has no requirement that it reimburses only for expenses incurred and in any case, Fresenius does incur an expense for overfill.

Crucial to this Court's analysis are the relevant Medicare rules and regulations applicable to the provision of ESRD drugs. These rules and regulations have evolved over time, and thus the Court first determines the relevant time period at issue here. Next, the Court considers the two interrelated issues presented by the parties' motions: (1) whether a provider can request reimbursement from the Government for the provision of a drug for which the provider itself did not incur an expense; and (2) whether dialysis centers incur an expense associated with overfill contained in vials of Epogen and Zemplar, or alternatively, whether overfill is "free" for purposes of Medicare reimbursement.

## A. Relevant Time Period

Neither Relator's Second Amended Complaint (Doc. 58) nor his summary

judgment briefing clearly indicates the precise time-period relevant to his allegations.[9] However, as explained below, Relator's primary argument is that Medicare payment for ESRD drugs is based upon costs and Medicare regulations provide that when payment is based upon costs, reimbursement is only allowed for "costs actually incurred." (Relator Summ. J. Br. at 1–2, 5, Doc. 93–1.) To support his argument that ESRD drugs are based on costs, Relator states that "since 2005, Medicare reimbursement for Epogen and Zemplar has been determined by Section 1847A of the Medicare Act, which was designed to apply a cost based system of reimbursement to drugs that had not previously been reimbursed based upon cost." (Relator Resp. Def. SUMF ¶ 146, Doc. 120; *see also* Relator Summ. J. Br. at 16, Doc. 93–1 (noting that prior to 2005, Medicare reimbursement for Part B drugs was based upon the manufacturers' Average Wholesale Price ("AWP"), which bore "no relationship to actual prices paid for drugs in the market").) Thus, it appears that Relator is pursuing his FCA violations for alleged improperly billed provisions of overfill starting in 2005. January 1, 2005 therefore serves as the starting date for the Court's legal analysis here.

To determine the ending date, the Court turns to Relator's response to Fresenius's

statement to get a false or fraudulent claim paid or approved by the Government"). The Court previously held that Fresenius's knowing submission of claims that falsely represent acquisition costs, which result in excessive reimbursement, would also constitute a use claim. (Doc. 57.) For purposes of the instant motion for summary judgment, the Court views the facts and law in the context of Relator's presentment claim, but notes that the analysis would be the same under either one. That is, if billing for overfill constitutes a false claim, the "false statement" element of both cause of action would be satisfied.

9. In contrast, Fresenius states that the relevant time period is from 2004 to 2010. As the Relator is the master of his Complaint, the Court turns to the Relator's allegations, and responses to Fresenius's assertions, to determine the scope of the Relator's claims. *See, e.g., W.G. Yates & Sons Const. Co. v. Zurich Am. Ins. Co.,* No. 06–0803–WS–B, 2008 WL 161921 at *4 n. 8 (S.D.Ala. Jan. 8, 2008) (refusing to consider causes of action plainly outside of the plaintiff's complaint).

motion for summary judgment. In its brief in support of its summary judgment motion, Fresenius asserts that the time period in this case ends in 2010. "The 2010 cutoff exists because, effective January 1, 2011, CMS adopted a 'bundled' reimbursement model that ended separate payments for drugs for ESRD facilities (like Fresenius) that adopted it. 42 C.F.R. § 413.174(f)(5)." (Def. Summ. J. Br. at 9, Doc. 107–2.) Fresenius then argues that it "opted-in to the 'bundle' and so is allowed to continue to administer overfill and be paid for its treatment." (*Id.* at 10 (citing 75 Fed Reg. at 73469).) Relator did not respond to these assertions. (*See* Relator Reply, Doc. 126; *see also* Relator Resp. Court's Aug. 9, 2013 Order ¶ 1, Doc. 141 (agreeing that effective January 1, 2011, Epogen and Zemplar were added to the bundled payment rate and were no longer separately billable for clinics, like Fresenius's clinics, that opted in to the bundle); Def. Resp. Court's August 9, 2013 Order ¶ 7, Doc. 142 (citing 42 U.S.C. § 1395rr(b)(14)(B)).) [10] Thus, for purposes of the parties' cross-motions for summary judgment, the Court applies December 31, 2010 as the ending date for its analysis. Accordingly, the question before the Court is whether Fresenius's practice of billing Medicare for the provision of overfill of Zemplar and Epogen from January 1, 2005 through December 31, 2010 constitutes false claims.

## B. Reimbursement for Expenses Incurred

Relator argues that Fresenius is prohibited from billing Medicare for providing overfill to its patients because the Medicare program only authorizes reimbursement to providers for expenses they actually incur. Relator appears to make *two* arguments here. First, Relator argues that *by definition* Fresenius is only reimbursed for costs actually incurred, and no costs are incurred associated with overfill. To support this argument, Relator asserts that "where Part B coverage is 'on a cost basis [the Secretary shall insure] that the cost is reasonable cost as determined under Section 1395x(v).' " (Relator Summ. J. Br. at 5, Doc. 93–1 (citing 42 U.S.C. § 1395u(b)).) Relator then notes that the statutory definition of "reasonable cost" is "costs actually incurred." (*Id.* (citing 42 U.S.C. § 1395x(v)).) Finally, Relator charges that because the cost of the drug is considered when calculating the reimbursement rate for Epogen and Zemplar, those drugs are reimbursed on a "cost basis."

The Court rejects Relator's contention that, during the relevant time periods, Zemplar and Epogen were reimbursed to dialysis facilities on a "cost basis," so as to trigger the "reasonable cost" definition under § 1395x(v). Section 1395rr(b)(2)(B) provides that the Secretary shall prescribe the methods and procedures to determine the reimbursement amount for ESRD drugs provided by dialysis facilities. 42 U.S.C. § 1395rr(b)(2)(B). This section expressly states that the Secretary's method must be "on a cost-related basis *or other economical or equitable basis.*" 42 U.S.C. § 1395rr(b)(2)(B). Medicare regulations,

---

**10.** Moreover, although CMS finalized a rule, effective January 1, 2011, stating that providers of certain drugs cannot bill Medicare for overfill, 75 Fed.Reg. 73170, 73626; 42 C.F.R. § 414.904(a)(3)(iii), this rule applies to "separately billable drugs at independent dialysis facilities not under the ESRD composite." 42 C.F.R. § 414.900(b) (listing examples of drugs subject to the ASP reimbursement methodology). And again, the parties agree that starting in 2011, Epogen and Zemplar were no longer considered separately billable drugs and instead part of the composite "bundled payment rate." (Relator Resp. Court's Aug. 9, 2013 Order ¶ 1, Doc. 141; Def. Resp. Court's August 9, 2013 Order ¶ 7, Doc. 142.)

in turn, specifically identify ESRD drugs like Zemplar and Epogen—those that are "separately billable drugs at independent dialysis facilities not under the ESRD composite rate"—as an example of drugs "*not* paid on a cost ... basis." 42 C.F.R. § 414.900(a)-(b) (emphasis added). And the parties agree that between 2005 and 2010, Zemplar and Epogen were not reimbursed under the ESRD composite rate, and instead were "separately billable." (*See* Doc. 141 ¶¶ 1, 2; Doc. 141 ¶¶ 1–4, 7.) Accordingly, the Court declines to adopt Relator's reasoning that ESRD drugs are reimbursed on a "cost basis" during the relevant time periods so as to trigger the "reasonable costs" definition provided in § 1395x(v).

Nonetheless, the Court agrees with the more general proposition that a provider cannot bill Medicare unless it first incurs some expense. Pursuant to 42 U.S.C. § 1395*l*(a), Medicare Plan B benefits (the benefits applicable to the drugs in this case) are payable "in the case of each individual who is covered under [Medicare Part B insurance program] and *incurs expenses* for services with respect to which benefits are payable under this part." 42 U.S.C. § 1395*l*(a) (emphasis added). This general introductory provision makes clear that Plan B benefits are only payable if the insured individual incurs an actual expense.

However, Medicare typically reimburses the *provider* instead of the covered individual and, keeping this in mind, other Medicare rules and regulations imply that Medicare only reimburses the provider where the provider incurs an expense associated with the provision of a covered service. For example, § 1395y(a) begins with the implicit assumption that payments are generally made for "expenses incurred." *See* 42 U.S.C. § 1395y(a). With this assumption in mind, § 1395y(a) pro-

vides a list of exceptions to the general rule that payment is made for expenses incurred. For example, even if the provider incurs an expense associated with an item or service, Medicare generally will not pay for such item or service unless the item or service was "reasonable and necessary for the diagnosis or treatment." *Id.* § 1395y(a)(1)(A). Nonetheless, § 1395y(a) implicitly recognizes the common-sense notion that Medicare is not in the business of making payments whatsoever in the absence of an incurred expense. *See also* 42 U.S.C. § 1395y(a)(2) ("[N]o payment may be made under part A or part B for any expenses incurred for items or services ... for which the individual furnished such items or services has no legal obligation to pay, and which no other person (by reason of such individual's membership in a prepayment plan or otherwise) has a legal obligation to provide or pay for, except in the case of Federally qualified health center services.").

Section 1395y(a) and other sections of the Medicare rule and regulations also recognize that even when providers do incur expenses, they will not necessarily be reimbursed by Medicare. In other words, that Medicare only reimburses for expenses incurred does not mean that Medicare reimburses 100 percent of an incurred expense. In some cases, Medicare reimburses only 80 percent of the "reasonable charges." 42 U.S.C. § 1395*l*. In other cases, Medicare might reimburse only for portions of "costs actually incurred, excluding ... any part of incurred costs found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v); *see, e.g., United States ex rel. Associates Against Outlier Fraud v. Huron Consulting,* 929 F.Supp.2d 245, 247 (S.D.N.Y.2013) ("Medicare usually reimburses providers a certain fixed amount. These payments are based on a predetermined schedule, and for most claims pro-

viders receive a fixed payment regardless of what the hospital lists as its actual charges for a given service."). However, even though Medicare may not reimburse for the total amount of the expense incurred, no rule or regulation suggests that Medicare is authorized to reimburse providers when the providers incur no expense.

■ The case of ESRD drugs like Epogen and Zemplar under Medicare Part B provides another example. Renal dialysis centers are reimbursed for expenses incurred—not based on the actual cost to the center, but rather, on a flat fee determined by the Secretary of Health and Human Services ("Secretary"). *See, e.g.,* 42 U.S.C. § 1395rr(b)(2)(B). For example, section 1395rr directs the Secretary to determine "the amounts of payments to be made for [P]art B services furnished by ... [renal dialysis facilities]." 42 U.S.C. § 1395rr(b)(2)(B). The Secretary must start by prescribing methods and procedures to "determine the costs incurred by providers of services and renal dialysis facilities in furnishing covered services to individuals determined to have end stage renal disease." *Id.* Guided by the costs incurred by providers, the Secretary is then directed to determine the reimbursement amount. *Id.* Although the Secretary may ultimately determine the reimbursement amount "on a cost-related basis *or other economical and equitable basis,*" *id.,*

implicit in this provision, and throughout the Medicare statute, is the principle that Medicare only reimburses some portion of incurred expenses.[11] In other words, asking the government to pay a portion of a debt that the provider never incurred amounts to a false claim on the government.

A district court in Texas came to this same conclusion in a similar case. *United States ex rel. Woodard v. DaVita,* No. 1:05–cv–227, slip op. at 12–13 (E.D.Tex. May 9, 2011). In *Woodard,* the relator alleged that DaVita, Inc. ("DaVita"), one of the nation's largest provider of dialysis services, violated the FCA by capturing, pooling and administering Epogen overfill that it received for free and then billing Medicare for this free overfill. *Id.* at 1, 9.[12] In denying DaVita's motion to dismiss this FCA claim, the court recognized the uncontroversial position that Medicare reimburses only for costs incurred, and not for free drugs. *Id.* at 12–13. "Medicare regulations dictate that reimbursable costs are costs 'actually incurred.'" *Id.* at 12 (citing 42 U.S.C. §§ 1395x(v), 1395rr(b)(2)(B)). The court accepted as true the relator's allegation that DaVita received overfill "free of cost." *See id.* at 13 ("[T]he complaint details a purported scheme by DaVita to extract and administer overfill, which it received free of cost, and to bill the government for that administration."). The Court then reasoned that

**11.** In its entirety, § 1395rr(b)(2)(B) reads as follows:

The Secretary shall prescribe in regulations any methods and procedures to (i) determine the costs incurred by providers of services and renal dialysis facilities in furnishing covered services to individuals determined to have end stage renal disease, and (ii) determine, on a cost-related basis or other economical and equitable basis (including any basis authorized under section 1395x(v) of this title) and consistent with any regulations promulgated under

paragraph (7), the amounts of payments to be made for part B services furnished by such providers and facilities to such individuals.

42 U.S.C. § 1395rr(b)(2)(B). Section 1395x(v) defines "reasonable cost of any service" to be the "cost actually incurred."

**12.** In *Woodard,* Relator's allegations specifically addressed the billing for overfill extracted from single-dose vials. *Woodard,* No. 1:05–cv–227, slip op. at 9.

by submitting the claim for overfill to the government as if it were an expense to DaVita, DaVita made a factually false claim. *Id.* at 13; *see also* 75 Fed.Reg. 73170, 73468 (Nov. 29, 2010) ("It has been longstanding Medicare policy that in order to meet the general requirements for coverage under the 'incident to' provision, services or supplies should represent an expense incurred by the physician or entity billing for the services or supplies.") (introducing regulations prohibiting the billing of free overfill).[13]

Courts and CMS have recognized, at least implicitly, this general proposition that Medicare does not pay providers for free goods. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 205, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Under the Medicare program, health care providers are reimbursed by the Government for expenses incurred in providing medical services to Medicare beneficiaries."); *Hays v. Leavitt*, 583 F.Supp.2d 62, 70 n. 5 (D.D.C.2008) ("The use of 'expenses incurred' may be understood to refer to the general scheme of the Act whereby beneficiaries and participating entities are reimbursed by Medicare for expenses incurred." (citing 42 U.S.C. § 1395*l*(a); *Bowen*, 488 U.S. at 205, 109 S.Ct. 468)); Cents. for Medicare & Medicaid Servs., Medicare Program Integrity Manual, Pub. No. 100–08, ch. 4, § 4.2.1, p. 9 (recognizing "[b]illing Medicare for costs not incurred" as an example of Medicare fraud), *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html (last visited Aug. 2, 2013). For example, as Relator points out, "[p]roviders may not bill for drugs they receive [for

free] from research sponsors that are used in clinical research studies." (Relator Summ. J. Br. at 7, Doc. 93–1; *id.* Ex. 2, Medicare Claims Processing manual, ch. 32 § 67, Doc. 93–3.) The definition of reimbursement itself implies an initial incurred expense that must be *re*-imbursed. *See* Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/reimburse (last visited Aug. 6, 2013) (defining "reimburse" as "to pay back to someone").

■ For these reasons, the Court finds that a provider submits a false claim to the government when it requests payment for the provision of a drug even though the provider itself incurred no expense associated with the drug. "The fraud is in asking the government to pay a debt that it does not owe because the debt was never incurred by the provider." *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F.Supp.2d 39, 67 (D.Mass.2011).

### C. Do Providers Incur an Expense Associated with Overfill?

■ The Court next turns to the issue at the heart of these cross-motions for summary judgment: During the relevant time periods, did Fresenius incur an expense associated with overfill of Zemplar and Epogen? To make this determination, the Court first identifies the lens through which it considers this issue. Next, the Court describes the relevant rules and regulations. Finally, the Court interprets these rules, guided by an analogous case analyzing the same relevant rule. Based on this interpretation, the Court finds that from 2006 through 2010, as a matter of law, Fresenius did not incur an expense

---

13. Fresenius is correct to point out that the recognition of this "longstanding Medicare policy" refers explicitly to "coverage under the 'incident to' provision", which applies to physician provision of services, not dialysis centers. (*See* Def. Summ. J. Br. at 10–11, Doc. 107–2.) But this does not detract from the general point that Medicare rules and regulations only authorize payment for incurred expenses.

associated with overfill of Epogen and Zemplar. Thus, submitting a request to the Government for reimbursement for the provision of these drugs during this time period constitutes a false claim.[14]

### 1. The Medicare Lens

What does it mean for overfill to be free? A grocery analogy is instructive. If one has a coupon for a free cantaloupe, no strings attached, one could then retrieve the cantaloupe from the store without incurring an expense. That cantaloupe is obviously free. In contrast, if one were to take advantage of a buy-one-get-one free deal on cantaloupes, although the buyer enjoys the feeling of getting something free, he in fact incurs an expense associated with the "free" fruit. Practically speaking, he did not get one cantaloupe free, but instead, got two cantaloupes at half the price. He incurred an expense associated with both fruits, and thus, the second fruit was not really free.

Overfill is like neither of these purchases. First, overfill is not purely free, like the free cantaloupe in the first example. If it were, this case would be much simpler. Relator introduces one example of a "free" drug for which providers incur no expense and thus cannot bill to Medicare: free drug samples. Research sponsors may provide doctors with free samples of drugs. CMS has explicitly recognized these free samples as "no cost items" for which providers may not seek reimbursement. (Relator Summ. J. Br. Ex. 1, Medicare Claims Processing manual, ch. 32 § 67, Doc. 93–2 (citing 42 U.S.C. § 1395y(a)(2)).) This makes sense because neither the provider, nor the individual, incurred any expense associated with the free sample. See 42 U.S.C. § 1395y(a)(2). A free drug sample is like the free cantaloupe with no strings attached. A dialysis center, however, only receives overfill when it purchases the drug in the first place. Thus, superficially, overfill is not exactly free.

On the other hand, overfill is not like the buy-one-get-one deal either. In that deal, the second cantaloupe is meant to be enjoyed *in addition* to the first. In contrast, overfill, by definition, is not meant to be administered in addition to the labeled amount of drug in the vial. Instead, overfill is a unique facilitating substance whose purpose is "to insure that nurses who must extract the liquid from the vial using syringes in ordinary (and often less-than-perfect) settings will be able routinely and reliably to visualize and extract at least the labeled volume from each vial." (Castle Decl., Doc. 100–4, ¶ 22 (emphasis removed).) *See, e.g.,* 75 Fed.Reg. 73170, 73468 ("[D]rugs and biologicals are supplied in various containers or kits that include accessories and diluents, as well as a variable amount of intentional overfill to ensure that the single dose is prepared and administered appropriately."); 75 Fed. Reg. 73170, 73466 ("[Overfill is] intended to compensate for loss of product when a dose is prepared and administered properly."). In a sense, overfill is like a syringe or other accessory whose primary purpose is to ensure that the labeled amount on the vial is properly administered. If the supplier can extract overfill for a separate administration, the provider has essentially

---

14. To be sure, a false claim against the government does not constitute a violation of the False Claims Act unless the false claim is presented to the Government with knowledge that the claim was false. *See United States ex rel. Walker v. R & F Props. of Lake County,* *Inc.,* 433 F.3d 1349, 1355 (11th Cir.2005) (citing 31 U.S.C. § 3729(a)). And as the Court has previously noted, the issue of the intent element of Plaintiff's FCA claim against Defendant is not properly before the Court.

mined the packaging to capture arguably free extra drug.

Nonetheless, Fresenius argues that because it buys the packaging, overfill, and drug altogether, it thus incurs an expense associated with the overfill: "Fresenius purchased (and paid for) the entire contents of vials ... from the manufacturer such that it paid for the overfill." (Def. Summ. J. Br. at 18, Doc. 107–2.) Fresenius explains that it buys Epogen and Zemplar by the vial, or pack of vials, or case of packs of vials, but not by the units inside a vial. (*See* Def. Summ. J. Br. at 18, Doc. 107–2 (citing Def. SUMF ¶¶ 51–54, 55, 62–63).) Fresenius also reported to the SEC and regulators that its acquisition expense included overfill. Thus, as far as Fresenius is concerned, overfill is not free and Fresenius does in fact incur an expense associated with it. This simple argument certainly has superficial, factual appeal.

Relator's primary response is that none of these facts matter because Medicare rules and regulations dictate that overfill is to be treated as free for reimbursement purposes.[15] Relator directs the Court to guiding Medicare rules and regulations applicable to the facts of this case and effective from 2006 through 2010. As explained next, the Court finds that the legal principles underlying these Medicare rules and regulations take the factual question of whether overfill is free and convert it into a question of law.

### 2. The Relevant Rules and Regulations

Beginning in 2005, Medicare reimbursed some providers of most Medicare Part B drugs based on the "Average Sales Price" ("ASP"). 42 U.S.C. § 1395w–3a;[16] 42 C.F.R. § 414.904. This ASP methodology began to apply to Zemplar and Epogen furnished by dialysis facilities like Fresenius on January 1, 2006. (*See* Relator Resp. Court's Aug. 9, 2013 Order ¶ 1, Doc. 141; Def. Resp. Court's Aug. 9, 2013 Order ¶ 1–4, 7 (citing 42 C.F.R. § 414.904(d)(2)(iii)).)[17]

"In simplified terms, a drug's ASP represents the manufacturer's total sales divided by the total number of units of the

---

15. Relator also argues that, to the extent overfill's status as "free" is purely a factual matter, how the *manufacturers* of Epogen and Zemplar viewed their contract with Fresenius is instructive. (*See* Relator Reply at 24–25, Doc. 126.) And in any case, Relator asserts that evidence currently in the record suggests *Fresenius itself* has considered overfill free. (*Id.*) However, from 2006 through 2010, for purposes of the falsity element (as opposed to the intent element) of the False Claims Act, what matters is not what Fresenius or the manufacturers believed was or was not free, but what the Medicare rules and regulations dictate is free and thus not reimbursable. And in any case, according to Relator this factual issue is not properly before the Court because the parties have not yet engaged in "complete discovery on this issue." (*See* Relator Reply at 24–25, Doc. 126.) At this time, the Court declines to address whether, in the absence of a Medicare rule or regulations, overfill is free for purposes of Medicare reimbursement.

16. This provision is the codification of Section 1847A of the Social Security Act, Pub.L. 108–173, Title III, § 303(c)(1), 117 Stat. 2239.

17. Relator states without elaboration that even prior to the 2006 application of ASP to Zemplar and Epogen for dialysis facilities, payment calculations excluded overfill. (Relator Resp. Court's Aug. 9, 2013 Order ¶ 2, Doc. 141.) Relator refers to page 8–9 of Exhibit F to Fresenius's Response to the Court's August 9, 2013. (*Id.*) Exhibit F has only two pages. As Relator has not fully developed this argument, the Court does not consider it on Relator's motion for summary judgment and limits itself to Relator's ASP theory. To be clear, the Court does not address whether prior to 2006, overfill was factored into the reimbursement calculation for ESRD drugs administered by dialysis centers.

drug sold in a quarter." *United States ex rel. Westmoreland v. Amgen, Inc.,* 812 F.Supp.2d 39, 65 (D.Mass.2011) (citing 42 U.S.C. § 1395w–3a(c)(1)(A)–(B)). Thus, if the sales price (the numerator) increases but the total number of units sold (the denominator) stays the same, the ASP increases.

Congress recognized that manufacturers have marketing strategies that reduce the cost to the purchaser. For example, a manufacturer might offer "volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, and rebates (other than rebates under [the Medicaid program])." 42 U.S.C. § 1395w–3a(c)(3). Congress decided that these "price concessions" must be taken into account when determining the Average Sales Price. *Id.*

One example of a price concession is like the buy-one-get-one-free deal the Court previously discussed. Imagine a manufacturer offers a "buy 10 vials, get one free" deal. Medicare includes this eleventh "free" vial when it calculates the cost of the drug. Thus, if the 10 vials cost $100, the Average Sales Price for that sale would be $100 divided by 11 (not 10) vials. This results in lowering the ASP from $10 per vial to about 9. And this "free" eleventh vial is not really free as far as Medicare is concerned. The manufacturers, providers and CMS all expect the providers to utilize the vial and provide the drug to patients. Accordingly, the reimbursement rate for all eleven vials is somewhat less due to this price concession. For purposes of Medicare reimbursement, the provider incurs an expense associated with this free eleventh vial.

The Medicare ASP statute also allows the Secretary to identify "other price concessions ... that would result in a reduction of the cost to the purchaser." 42 U.S.C. § 1395w–3a(c)(3). Despite awareness that manufacturers include overfill in the sale of drugs to providers, the Secretary has never identified overfill as a price concession that would result in a reduction of the cost to the purchaser. Thus, it appears Medicare takes the position that, regardless of what providers may think, overfill is not part of the cost of the drug. As the Court next explains, this is the conclusion one district court recently came to.

### 3. Analysis of the Relevant Medicare Rules and Regulations: Westmoreland

The parties have directed the Court to one case analyzing the same Medicare statute and regulations controlling here. *See United States ex rel. Westmoreland v. Amgen, Inc.,* 812 F.Supp.2d 39 (D.Mass. 2011). In *Westmoreland,* the court addressed overfill and the ASP methodology in a similar *qui tam* case further up the supply chain. The relator in *Westmoreland* sued Amgen, the manufacturer (rather than provider) of Aranesp, an ESRD drug. The relator alleged two theories of fraud liability.

First, according to the relator in *Westmoreland,* defendant Amgen should have taken into account the inclusion of overfill when reporting Aranesp's ASP to Medicare. *Id.* at 64. The evidence before the court suggested that Amgen had not done so and the relator used this as a springboard for an FCA violation.

Second, the relator asserted that Amgen induced the submission of false claims by encouraging dialysis providers to bill Medicare for the overfill amount. *Id.* at 64. Under this theory of liability, Amgen allegedly disregarded overfill when reporting ASP to Medicare but considered overfill when marketing its product. Thus, while Medicare calculated the reimburse-

ment rate without regard to overfill (because that is how Amgen reported ASP), Amgen allegedly knowingly encouraged providers to bill for overfill. In doing so, the relator argued that Amgen violated Medicare rules.

The relator in *Westmoreland* moved for summary judgment only on the first issue, whether Amgen must report overfill as part of the Average Sales Price of the drug. The Court held that not only was Amgen allowed to disregard overfill from its ASP reporting, Medicare required this approach. The court first recognized that the ASP methodology provided a limited list of "price concessions" to factor in to a drug's ASP calculation, and overfill was not one of them. *Id.* at 65–66. The court then noted that the statute authorizes CMS to identify additional price concessions "that would result in a reduction of the cost to the purchaser." *Id.* (citing 42 U.S.C. § 1395w–3a(c)(3)). However, because CMS has never identified overfill as a price concession, the court reasoned that overfill was not to be considered part of the cost of the drug to the purchaser. *Id.;* *see also* 42 C.F.R. § 414.804(a)(2)(i) (listing price concession). Accordingly, the court found that CMS's ASP calculation method-

ology from 2005 through 2010 not only allowed manufacturers to disregard overfill when submitting ASP calculations, but actually *required* it. Thus, Amgen's decision to disregard overfill in its Aranesp ASP reports to Medicare was consistent with CMS rules.

For further support, the court turned to a 2011 rule explicitly stating that overfill shall not be considered when calculating ASP. *Id.* at 66–67 (citing 75 Fed.Reg. at 73467–69). As of January 1, 2011, by law, overfill is considered a free product for which certain providers cannot bill Medicare. 42 C.F.R. § 414.904(a)(3)(ii) ("Additional product contained·in the vial or other container does not represent a cost to providers...."). The rule also stated that "[n]o payment is made for amounts of product in excess of that reflected on the FDA-approved label." *Id.* § 414.904(a)(3)(iii).[18]

According to the court, the 2011 rule confirmed existing overfill policy, rather than establishing a new one. *Id.* "CMS's rules and regulations confirm Amgen's position that overfill is not, and never was to have been, accounted for in Aranesp's ASP calculation." *Id.* at 67. The court high-

---

**18.** As of January 1, 2011, by law, overfill is considered a free product for which certain providers cannot bill Medicare. 42 C.F.R. § 414.904(a)(3)(ii) ("Additional product contained in the vial or other container does not represent a cost to providers...."). The rule also stated that "[n]o payment is made for amounts of product in excess of that reflected on the FDA-approved label." *Id.* § 414.904(a)(3)(iii). However, as of January 1, 2011, the rule does not apply to Epogen and Zemplar provided by ESRD dialysis facilities like Fresenius that opt in to the composite rate system because the drugs are no longer separately billable and thus do not fall under the regulation's scope. *See* 42 C.F.R. § 414.904(a)(3) (noting that subsections (3)(i)-(iii) apply "[f]or purposes of this paragraph [subsection (a)]" which addresses Average Sales Price methodology); *Id.* § 414.900(b)(2)

(identifying as an example of a drug subject to this section, "separately billable drugs at independent dialysis facilities not under the ESRD composite rate"). In any case, as the Court explained above in Part IV.A, the relevant time period for Relator's claims ends on December 31, 2010, and thus the 2010 rule is not controlling here. *See* 75 Fed.Reg. 73170 (recognizing the effective date for this rule as January 1, 2011); *see also United States ex rel. Woodard v. DaVita, Inc.,* No. 1:05–cv–0227, slip op. at 12 n. 5 (E.D.Tex. May 9, 2011) ("[Relator] cannot base allegations of billing impropriety on a newly-passed regulation that contains no indication that it applies retroactively, as such application would subject DaVita to increased liability for past conduct." (citing *Blaz v. Belfer,* 368 F.3d 501, 503 (5th Cir.2004)) (addressing billing for ESRD drug overfill)).

lighted several places throughout the rule recognizing the existing principle that overfill had never been part of the ASP calculation. *Id.* at 67–68. Bolstered by the 2011 rule, the Court held that Amgen's decision to exclude overfill from its ASP reporting was consistent with Medicare rules and regulations.

The Court also addressed, in dicta, the relator's second theory of liability, that a drug manufacturer who knowingly disregards overfill in its ASP reports but encourages the billing of that overfill to Medicare violates the FCA. *Id.* at 70. Again, using the 2011 Rule as a guide, the Court credited relator's theory:

> CMS's November 2010 rule [which is a clarification of existing policy] has two parts: first, overfill is not a cost to the provider and thus is not a factor in a drug's ASP, and, second and accordingly, providers must not bill Medicare for overfill. The first part of the rule necessitates the second part if the government is to be protected from false claims. Only together do these two parts create a workable approach to Medicare reimbursement. The fact that the second part of the rule may have been violated in this case by Amgen allegedly encouraging providers to bill for overfill does not mean the Court must carve out an exception to the applicability of the first part of the rule for Amgen's calculation of Aranesp's ASP. Rather, Amgen was required to comply with both parts of the rule, and the fact that it complied with the first part does not preclude liability at trial for causing providers to submit false or fraudulent claims in violation of the second part.

*Id.* at 69–70. Thus, the court indicated that a provider could not bill the Government for overfill of a drug subject to the ASP calculation because overfill is not part of that calculation and thus not part of the cost of the drug to the provider, according to Medicare. "The fraud is in asking the government to pay a debt that it does not owe because the debt was never incurred by the provider." *Id.* at 67. The 2011 rule confirmed this understanding.

The Court finds the reasoning of *Westmoreland* persuasive. From 2006 through 2010, CMS understood that manufacturers included overfill in vials of drugs like Epogen and Zemplar; in fact, manufacturers were required to do so by law. (*See* Castle Decl. ¶¶ 22–23, Doc. 100–4 (citing 21 U.S.C. § 351(b) (federal statute requiring compliance with the United States Pharmacopoeia, which includes 'overfill' requirement); 21 C.F.R. § 201.51(g) ("In the case of a liquid drug in ampules or vials, intended for injection, the [FDA-approved label] shall be considered to express the minimum quantity and the variation above the stated measure shall comply with the excess volume prescribed by the National Formulary or the U.S. Pharmacopeia . . . .")).) And yet, CMS has never instructed manufacturers to factor this amount of drug (the overfill) into their ASP calculations. *See* 42 U.S.C. § 1395w–3a(c)(3); 42 C.F.R. § 414.804(a)(2)(i); *see also Westmoreland*, 812 F.Supp.2d at 65. Moreover, manufacturers are ill-equipped to calculate overfill amounts. *See* 75 Fed. Reg. at 73468–69 (recognizing the "operational difficulty in accurately identifying the amount of overfill"); *Id.* at 73468 ("The amount of overfill in vials varies from drug to drug and often is not easily or consistently quantifiable because actual fill amounts may also vary slightly due to the manufacturing process.").

Thus, as far as Medicare is concerned, when the cost of the ESRD drug is determined by its average sales price—in this case, from 2006 through 2010—overfill is by law not part of the cost of the drug to the provider. The Medicare rules and

regulations take into account the practical difficulties in assessing the amount of overfill in a given container, the purpose of overfill, and the challenges in determining an equitable reimbursement value. According to these specialized rules of guaranteed reimbursement, when a provider purchases a drug containing overfill, it only buys the amount of drug labeled on the vial and it thus can only seek reimbursement for that amount.[19]

Fresenius urges the Court to disregard *Westmoreland*, arguing that *Westmoreland* "did not involve ESRD clinics and did not involve Epogen." (Def. Summ. J. Br. at 32, Doc. 107–2.) Although it is true that the defendant in *Westmoreland* was the manufacturer of the ESRD drug rather than an ESRD dialysis center, the court in *Westmoreland* expressly found that "providers must not bill Medicare for overfill." *Westmoreland*, 812 F.Supp.2d at 69–70. And the court recognized the viability of the relator's claim against Amgen premised on Amgen's alleged attempt to "caus[e] providers to submit false or fraudulent claims in violation" of this Medicare rule. *Id.* at 70. Accordingly, the Court relies on *Westmoreland* as persuasive authority on the issue of whether providers were allowed to bill for the utilization of overfill prior to 2010.

The Court also rejects Fresenius's argument that the prohibition on billing for overfill should apply, if at all, only to physicians and not dialysis facilities like Fresenius. According to Fresenius, when CMS announced its "longstanding policy" prohibiting the billing of overfill, it specifically referred to the section of the Medicare rules applicable only to physicians. (Def. Summ. J. Br. at 31, Doc. 107–2.) This may be true, but Fresenius pointed to no authority authorizing reimbursement for the provision of drugs any provider receives for free. Likewise, the court in *Westmoreland* did not suggest that its reasoning was limited to inducing physicians, rather than ESRD facilities, to submit false claims. And how could it? During the relevant time periods, ESRD facilities were reimbursed based on the ASP methodology just like physicians, and, as the Court finds, the ASP methodology did not allow for the inclusion of overfill into the calculation.

Fresenius also suggests that the testimony (in a different case) of John Warren, CMS's head of dialysis policy, represents CMS's position on this issue and demonstrates that CMS did not prohibit dialysis centers from billing for overfill prior to 2011. (Def. Summ. J. Br. at 2–3, Doc. 107–2.)[20] However, Mr. Warren's

---

**19.** The Court recognizes that perhaps in ordinary marketplace terms, the provider exchanges money for a product that includes overfill, and thus *technically*, a provider pays for the overfill just as one pays for a bag when she buys a bag of potato chips. But this case does not exist in the ordinary marketplace. Here, the Medicare rules and regulations prescribe how manufacturers and providers should view overfill for purposes of Government reimbursement.

**20.** As the Court does not rely on Mr. Warren's testimony when ruling on the parties' cross-motion for summary judgment, the Court need not decide whether Mr. Warren's testimony is admissible at this stage. The Court

notes, however, that the general rule on summary judgment is that the district court may consider documents if they "could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir.1999). Here, there is no reason to believe that, if this case were to go to trial, the parties would be unable to call Mr. Warren to testify. The Court is also not convinced that Mr. Warren's testimony is hearsay. *See* Fed.R.Evid. 801(d)(2) (stating that an opposing party's statement is not considered hearsay); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D.Md.1995) (holding that a statement by a government agency constitutes a statement of

testimony is contradictory and thus inconclusive on this issue. On one hand, Warren agreed with the following statement: "[W]ith respect to dialysis providers, whether they were small or big, the then existing current policy [up to 2011] was to permit billing for overfill." (Def. Mot. Summ. J. Ex. OO ("Warren Dep.") at 177–78, Doc. 104–3.)[21] On the other hand, Warren suggested that the "then existing current policy" referred to express, written policy. He testified that "the fact that we hadn't ... made a statement until 2010, I don't think we should take that as being tacit or implicit approval of the action, just that we hadn't made a statement on it yet." (Relator Resp. SUMF Ex. 7 ("Warren Dep.") at 157–58, Doc. 120–7.) Later on, Warren stated that "as a general rule, [CMS] shouldn't make payments for anything that doesn't represent a cost to a provider or a physician as part of our fiduciary responsibility as protectors of the [Medicare] trust funds." (*Id.* at 420.) Thus, Warren's testimony can be relied upon for any number of propositions depending on what pages one considers.[22] In any event, Warren agrees that, to determine Medicare's policy on billing for overfill prior to 2011, "you would look at general policies concerning billing and reimbursement for Medicare." (*Id.* at 290.) This is precisely what the Court has done here.

For the reasons discussed above, the Court finds that from 2006 through 2010, Fresenius's requests for reimbursement for the utilization of overfill of Zemplar and Epogen constitute false claims.

## D. Intent

As previously noted, given the bifurcated summary judgment briefing schedule the parties agreed to, the question of whether Fresenius's interpretation of the Medicare rules and regulations is reasonable, and thus whether Fresenius had the requisite intent to defraud, is not properly before the Court. The Court **DENIES** Fresenius's motion for summary judgment on the issue of intent, with leave to file a renewed summary judgment motion after the close of discovery.

The Court recognizes, however, that, just as in *Westmoreland*, "liability in this case may turn on whether CMS's policy prohibiting reimbursement of overfill was sufficiently clear prior to the issuance of its November 2010 rule, such that [Fresenius's conduct] if proved, must have been undertaken at least in reckless disregard of the policy." *Id.* at 71.[23] The Court leaves that issue, and the unresolved issues of fact discussed in Part IV.C.1, for determination on subsequent motions for summary judgment after the close of discovery or for the jury after trial.

a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the government is the real party in interest); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 935–36, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009) (reaffirming the principle that the United States in a non-intervened FCA case remains the real party in interest, but holding that in such a case, the government is not a party for purposes of Fed.R.Civ.P. 4(a)(1)(B)).

21. When referencing deposition testimony, the Court refers to the page number of the

deposition transcript, not the page of the PDF file.

22. Warren's testimony is potentially relevant to the issue of Fresenius's intent but not helpful here where Fresenius expressly states it is not pursuing an estoppel defense.

23. For his part, Relator directs the Court to some evidence suggesting that despite the ambiguity in the Medicare rules, Fresenius knew CMS prohibited billing for overfill. (*See* Realtor Reply at 18, Doc. 126.)

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Relator's Partial Motion for Summary Judgment [Doc. 93]. The Court finds that, based on the facts here presented, between January 1, 2006 and December 31, 2010, Fresenius's practice of billing Medicare for overfill of Epogen and Zemplar provided to patients constitutes a false claim because, as a matter of law, it represents billing for an expense the provider did not incur. The Court **DENIES** Relator's and Fresenius's cross-motions for summary judgment [Doc. 93, 100] on all other issues presented.

As the Court ordered (and the parties agreed), discovery ceased in this case until the Court's disposition of these partial summary judgment motions. Prior to the Court's lift of the stay in the discovery, the parties are **DIRECTED** to file an amended joint discovery plan within **FOURTEEN (14)** days of this Order. The joint plan must include deadlines for the conclusion of fact discovery and depositions of expert witnesses.

